IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NAVAJO NATION, a federally recognized
Indian Tribe, on its own behalf, by Ethel B.
Branch, Attorney General of the Navajo
Nation, and as *parens patriae* on behalf of
the Navajo people,

      Plaintiff,

vs.                                Case No. 1:17-cv-01219-JAP-SCY

WELLS FARGO & COMPANY; WELLS
FARGO BANK, N.A.; and DOES 1-10,

      Defendants.

**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CLAIMS OR,
<u>IN THE ALTERNATIVE, TO STAY PLAINTIFF'S *PARENS PATRIAE* CLAIMS</u>**

# TABLE OF CONTENTS

I.     INTRODUCTION ......................................................................................................1

II.    BACKGROUND ........................................................................................................2

III.   ARGUMENT ............................................................................................................4

    A.    Plaintiff's Claims Under the Consumer Financial Protection Act Are
    Barred by the CFPB's Consent Order, and Plaintiff's Purported *Parens
    Patriae* Claims Are the Subject of a Pending Class Action Settlement
    Which Will Bar Plaintiff's Claims Once Final. ........................................................4

        1.    Plaintiff's Claims Under the Consumer Financial Protection Act
        Are Barred by *Res Judicata.* ........................................................5

            (a)    The CFPB's Consent Order Is a Final Administrative
            Decision. ........................................................5

            (b)    The CFPB, the Primary Enforcer of the CFPA, Is in Privity
            With Plaintiff, a Secondary Enforcer of the Act. ...............................6

            (c)    Wells Fargo Bank, N.A. and Wells Fargo & Co. Are in
            Privity for Purposes of *Res Judicata* Against Plaintiff's
            CFPA Claims. ........................................................8

            (d)    The CFPB's and Plaintiff's Claims Under the CFPA
            Constitute the "Same Cause of Action." ......................................10

            (e)    The CFPB Had a Full and Fair Opportunity to Litigate. ...............11

        2.    Plaintiff's *Parens Patriae* Claims Are Duplicative of a Pending
        Class Action Settlement, and Should Be Stayed. ........................................12

    B.    Plaintiff Lacks Standing to Assert Its *Parens Patriae* Claims. ...............................14

        1.    Plaintiff Lacks *Parens Patriae* Standing to Assert Common Law
        Claims on Behalf of Individual Tribal Members. ........................................14

        2.    Plaintiff Lacks Standing to Assert Statutory Claims Reserved for
        Other Enforcement Authorities or Private Citizens. ...................................16

    C.    Plaintiff's Declaratory Judgment Claim, Premised on Claims Either
    Barred by *Res Judicata* or Which It Lacks Standing to Assert, Must Be
    Dismissed. ........................................................................................................19

    D.    Plaintiff Fails to Plausibly Allege *Parens Patriae* Statutory and Common
    Law Claims. ......................................................................................................20

1.   Plaintiff Does Not Allege That Wells Fargo Refused Credit to
Tribal Members, Precluding a Discrimination Claim Under the
ECOA ............................................................................................. 20

2.   Plaintiff Fails to Plausibly Allege *Parens Patriae* Claims Based on
Fraud or Conversion. ..................................................................... 22

(a)   Plaintiff Fails to Plead Its Fraud Claim, Brought as *Parens
Patriae*, With Sufficient Particularity. .............................. 22

(b)   Plaintiff Fails to State a Claim for Conversion. ............................. 25

E.   The Nation Fails to State a Claim of Common Law Fraud in Its Own
Capacity. .......................................................................................... 26

IV.   CONCLUSION .................................................................................................. 27

Defendants Wells Fargo Bank, N.A. ("WFBNA") and Wells Fargo & Company ("WFC" and, with WFBNA, "Defendants") move to dismiss the claims asserted by the Navajo Nation on its own behalf, through its Attorney General, and as *parens patriae* on behalf of members of the Navajo Nation ("Plaintiff"), on the grounds of *res judicata,* lack of standing, and failure to state a claim.  Alternatively, with respect to the claims Plaintiff asserts in a *parens patriae* capacity, Defendants request a limited stay pending resolution of a nationwide consumer class action settlement which will constitute a final adjudication of those claims which Plaintiff purports to assert on behalf of members of the Navajo Nation.

## I.     INTRODUCTION

Plaintiff summarizes its Complaint as seeking "relief from Wells Fargo's widespread system of unfair, deceptive, fraudulent and illegal practices" of opening bank accounts and services without customer authorization (Compl. ¶ 1), but the only relief Plaintiff seeks would constitute double recovery for the same legal interests which other parties in privity with Plaintiff have already pursued.  Of the 17 claims Plaintiff asserts in its Complaint, 16 claims are either already barred by principles of *res judicata* (on the basis of an enforcement action previously brought by a federal agency as primary enforcer for the federal consumer protection statute Plaintiff invokes in this case, in which Wells Fargo paid $100 million) or soon will be (on the basis of a $142 million nationwide class action settlement which will provide compensation for and release the claims of tribal members which Plaintiff purports to assert in this action as *parens patriae*).  In light of Wells Fargo's payment of $242 million to fully resolve the legal interests Plaintiff seeks to represent, there is no need for Plaintiff to pursue duplicative claims in this case—nor is there any legal justification which would allow it to do so.

The theory driving Plaintiff's one remaining claim for fraud, asserted on Plaintiff's own behalf, is that in January 2017 Wells Fargo misrepresented to Plaintiff the extent to which any

improper sales practices affected members of the Navajo Nation, allegedly "in an effort to dissuade the Navajo Nation from investigating the effect of Wells Fargo's sales practices on its citizens." (*Id.* ¶ 181.) Plaintiff does not articulate any concrete injury that resulted from this alleged fraud, nor could it: Mere delay in bringing suit is insufficient to prosecute a claim for fraudulent concealment, and the same causes of action which Plaintiff asserts in this lawsuit were being pursued by more appropriate parties, sharing a privity of interests with Plaintiff, long before the alleged misrepresentation.

There is a more fundamental issue with respect to the claims that Plaintiff asserts in a *parens patriae* capacity: Plaintiff lacks standing to usurp the personal damages claims of individual tribal members who have a legal right to assert these claims on their own behalf. Whether the Court dismisses these *parens patriae* claims for lack of standing, or stays litigation of these claims by Plaintiff until the first-filed consumer class action gains finality for purposes of *res judicata*, it is clear that judicial economy and due process are not well served by Plaintiff's prosecution of this action.

## II.     BACKGROUND

Plaintiff asserts that Wells Fargo's improper sales practices "came to light" in September 2016 when the Consumer Financial Protection Bureau ("CFPB") issued a Consent Order "with Wells Fargo based on a widespread scheme of illegal and unfair business practices that included" opening deposit accounts, submitting credit card applications, enrolling customers in online banking, and activating debit cards—all without customer knowledge or consent. (Compl. ¶¶ 3–4, 16.) The CFPB Consent Order reflected findings of fact and conclusions of law under the federal Consumer Financial Protection Act ("CFPA"), required the implementation of a redress plan, levied a $100 million fine, and ordered an additional $5 million to be set aside for restitution to affected consumers. (*See generally,* Request for Judicial Notice ("RJN"), Ex. 1

(hereinafter, "Consent Order").)  The Consent Order was expressly labeled a "final" order, issued pursuant to the CFPB's adjudicative authority under the CFPA.  (*Id.* ¶ 86.)  Plaintiff, as a secondary enforcer under the CFPA, invokes the same Act in this lawsuit on the basis of the same conduct.  (*See* Compl., Claims 1-5.)

The same month the CFPB Consent Order was issued, September 2016, Defendants reached a settlement in principle for a nationwide consumer class action relating to the same improper sales practices and opening of unauthorized banking products in *Jabbari, et al. v. Wells Fargo & Co., et al.*, Case No. 3:15-cv-02159-VC (N.D. Cal.) ("*Jabbari* Action"), a putative class action filed in 2015.  (RJN, Ex. 2.)  The complaint in the *Jabbari* Action alleged that Wells Fargo opened banking products and services for consumers without consent, and also "us[ed] high pressure sales tactics to coerce customers into opening additional accounts or us[ed] inaccurate or misleading information about potential accounts to induce customers to open them."  (*Id.*, Ex. 3 ¶¶ 32, 36–42 (*Jabbari* Consolidated Amended Complaint).)   In the instant lawsuit, Plaintiff asserts claims belonging to individual tribal members in a *parens patriae* capacity under identical legal theories as those asserted in the *Jabbari* Action, including claims for violation of the Arizona Consumer Fraud Act, the federal Fair Credit Reporting Act, the federal Electronic Funds Transfer Act, and common law claims for conversion and unjust enrichment.  Plaintiff's Complaint asserts additional claims arising from the same core set of operative facts as in the *Jabbari* Action, such as a common law claim for fraud, and violation of other federal consumer protection statutes and the New Mexico and Navajo Nation unfair consumer protection acts.  The tribal members that Plaintiff purports to represent as *parens patriae* are absent class members in the *Jabbari* Action who stand to recover on their claims through a $142 million class action settlement which has received preliminary approval, and is

scheduled for a final approval hearing on March 22, 2018. (*Id.*, Exs. 4 (*Jabbari* Amended Settlement Agreement), 5 (Preliminary Approval Order), & 6 (Scheduling Notice re. Final Approval Hearing).) The deadline for tribal members to opt out of the *Jabbari* settlement passed on February 19, 2018. (*Id.*, Ex. 7 at 4.) Once the *Jabbari* settlement becomes final, class members will have released, "to the fullest extent permitted by law or equity, any and all claims and causes of action of every nature and description, known and Unknown, whether arising under federal, state, common or foreign law, or any other law, rule, or regulation, that were asserted, or that arise out of the identical factual predicate as the claims that were asserted, in the [*Jabbari*] Action, commensurate with the res judicata effect at the conclusion of the litigation." (*Id.,* Ex. 4 (*Jabbari* Amended Settlement Agreement) ¶ 2.50.)

## III.    ARGUMENT

### A.    Plaintiff's Claims Under the Consumer Financial Protection Act Are Barred by the CFPB's Consent Order, and Plaintiff's Purported *Parens Patriae* Claims Are the Subject of a Pending Class Action Settlement Which Will Bar Plaintiff's Claims Once Final.

*Res judicata* may be raised in a motion to dismiss. *Miller v. Shell Oil Co.*, 345 F.2d 891 (10th Cir. 1965). "Under *res judicata*, or claim preclusion, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in the prior action." *Wilkes v. Wyo. Dep't of Emp't*, 314 F.3d 501, 503–04 (10th Cir. 2002) (citing *Satsky v. Paramount Commc'ns, Inc.*, 7 F.3d 1467 (10th Cir. 1993)). "The doctrine of claim preclusion serves the 'fundamental policies' of 'finality, judicial economy, preventing repetitive litigation and forum-shopping.'" *In re Davis*, 188 F. App'x 671, 675 (10th Cir. 2006). The CFPB adjudicated the same causes of action under the CFPA that Plaintiff asserts here, and secured a $100 million penalty and redress plan through a final order; Plaintiff's legal interests in enforcement of the Act relating to Wells Fargo's sales practices have thus been adequately represented. Plaintiff's attempt to assert *parens patriae* claims relating to Wells Fargo's sales practices competes with the individual tribal members' recovery on their own legal claims

4

through the class action settlement which is moving towards final approval.  Plaintiff's pursuit of the personal damages of tribal members through this action threatens judicial economy as well as the tribal members' entitlement under due process to assert their own legal rights.  At a minimum, Plaintiff's *parens patriae* claims should be stayed to allow for the *Jabbari* settlement to become final and attain preclusive effect.

> **1.     Plaintiff's Claims Under the Consumer Financial Protection Act Are Barred by *Res Judicata*.**

The Consumer Financial Protection Act affords the CFPB primary enforcement authority over the Act.  12 U.S.C. § 5564.  "In addition to litigation authority, Part E of the Act provides that the CFPB has investigatory powers, 12 U.S.C. § 5562, [and] adjudication powers, 12 U.S.C. § 5563." *CFPB v. Navient Corp.*, 2017 WL 3380530, at *7 n.4 (M.D. Pa. Aug. 4, 2017).  Plaintiff acknowledges that in September 2016 the CFPB entered a Consent Order "finding that Wells Fargo Bank, N.A. had violated the Consumer Financial Protection Act," and "levied a $100 million civil penalty on Wells Fargo for its unlawful sales practices." (Compl. ¶¶ 27, 30.)  Yet, Plaintiff purports to assert claims under the Act for the same conduct.

*Res judicata* requires: (1) a judgment on the merits in the earlier action; (2) identity of the parties or privies in the two suits; and (3) identity of the cause of action in both suits. *Yapp v. Excel Corp.*, 186 F.3d 1222, 1227 (10th Cir. 1999). When these elements are met, "*res judicata* is appropriate unless the party seeking to avoid preclusion did not have a full and fair opportunity to litigate the claim in the prior suit." *MACTEC, Inc. v. Gorelick*, 427 F.3d 821, 831 (10th Cir. 2005) (citing *Yapp*, 186 F.3d at 1226 n.4).  A final adjudicative determination by an administrative body is afforded the same preclusive effect under rules of *res judicata* as a judgment of a court, and thus Plaintiff's claims under the CFPA are barred by *res judicata*.

> **(a)     The CFPB's Consent Order Is a Final Administrative Decision.**

"The United States Supreme Court has 'long favored application of the common-law doctrines of collateral estoppel (as to issues) and *res judicata* (as to claims) to those determinations of administrative bodies that have attained finality.'" *Brockman v. Wyo. Dep't of Family Servs.*, 342 F.3d 1159, 1166 (10th Cir. 2003) (quoting *Astoria Fed. Sav. & Loan Ass'n v.*

*Solimino,* 501 U.S. 104, 107 (1991)).  A contrary holding would "impose unjustifiably upon those who have already shouldered their burdens, and drain the resources of an adjudicatory system with disputes resisting resolution. The principle holds true when a court has resolved an issue, and should do so equally when the issue has been decided by an administrative agency . . . which acts in a judicial capacity." *Astoria,* 501 U.S. at 107–08 (citations omitted).  Here, the Consent Order expressly states that it is issued under 12 U.S.C. § 5563, a section of the Act reflecting the CFPB's adjudicatory authority, and 12 U.S.C. § 5565, which provides the CFPB jurisdiction to grant legal and equitable relief in an "adjudication proceeding brought under Federal consumer financial law." *Id.* (cited in Consent Order at 1).  The Consent Order contains findings of fact and conclusions of law with respect to Wells Fargo's sales practices, consistent with the requirement under 12 U.S.C. § 5563(b)(3) that the CFPB render a decision "which shall include findings of fact upon which its decision is predicated."  Finally, the Consent Order makes clear that it "is intended to be, and will be construed as, a final Consent Order issued under § 1053 of the CFPA, 12 U.S.C. § 5563." (Consent Order ¶ 86.)  Thus, the Consent Order constitutes a final judgment for purposes of the application of *res judicata.*[1]

        **(b)**       ***The CFPB, the Primary Enforcer of the CFPA, Is in Privity With Plaintiff, a Secondary Enforcer of the Act.***

Plaintiff is in privity with the CFPB for purposes of enforcement of the CFPA, enabling the application of *res judicata* to bar Plaintiff's claims under the Act.  Privity "convey[s] the existence of a relationship sufficient to give courts confidence that the party in the former litigation was an effective representative of the current party's interests." *Entek GRB, LLC v. Stull Ranches, LLC,* 763 F.3d 1252, 1258 (10th Cir. 2014).  Under the CFPA, one of the CFPB's

---

[1] Even if the CFPB had not been acting as an adjudicatory body in issuing the Consent Order, a typical consent decree reached between two parties in litigation and entered by a court "is afforded the same effect as any other judgment." *Satsky,* 7 F.3d at 1468. "While a consent decree is accorded the weight of a final judgment, it 'is to be construed . . . basically as a contract,'" and thus courts "must look to the consent decree itself to determine if the decree represents a final judgment on the merits." *Id.*  The Consent Order here includes an express release (Consent Order ¶ 85), but also expressly provides that it is *not* a contract (*id.* ¶ 86), further confirming that the order is a final adjudicatory determination from an administrative body.

primary functions is to "tak[e] appropriate enforcement action to address violations of Federal consumer financial law." 12 U.S.C. § 5511(c).  The Act designates as secondary enforcers the attorney general of any U.S. state, territory, or "any federally recognized Indian tribe."  *Id.* § 5481(27); *id.* § 5552(a). Prior to initiating any such action, these attorneys general must provide notice to the CFPB, and the CFPB may intervene in the action or appeal any resulting order or judgment. *Id.* § 5552(b). These provisions for notice and intervention confirm that the CFPB and secondary enforcers have overlapping authority, but that the CFPB is in the driver's seat in ensuring consistent enforcement of federal consumer financial laws.

"The crucial point is whether or not in the earlier litigation the representative of the United States had authority to represent its interests in a final adjudication of the issue in controversy"; where "[t]here can be no question that [an administrative body] was authorized to make the determination" at issue, privity will be found between governmental bodies.  *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 403 (1940).  The primary enforcement authority granted to the CFPB establishes that the CFPB shared an identity of interests with Plaintiff in prosecuting claims under the Act against Wells Fargo relating to its sales practices.  Similarly, in *State Water Control Board v. Smithfield Foods, Inc.*, 261 Va. 209 (2001), the Virginia Supreme Court found privity between the federal Environmental Protection Agency and the state of Virginia where "the [state's] legal right" in bringing an enforcement action pursuant to a dual enforcement scheme of the Clean Water Act "was represented by the EPA" in a previous federal enforcement action.  *Id.* at 216.  The court observed that the "ability of both the [state] Board and the EPA to undertake enforcement activities" did not "override the joint undertaking" for "protection of the separate but mutual interests of two sovereign governments" which supported the application of *res judicata. Id.*[2]  The same result is compelled here.

---

[2] The Tenth Circuit has noted that, to apply *res judicata* against the <u>federal</u> government, the United States must have a "laboring oar" in the controversy. *See United States v. Power Eng'g Co.,* 303 F.3d 1232, 1240 (10th Cir. 2002) (state enforcement action under state statute did not bar EPA action under federal statute). That standard is inapplicable here given that the federal

> **(c)      Wells Fargo Bank, N.A. and Wells Fargo & Co. Are in Privity for Purposes of Res Judicata Against Plaintiff's CFPA Claims.**

Privity between defendants for purposes of *res judicata* "requires a showing that the parties in the two actions are 'really and substantially in interest the same.'"  *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1240–41 (10th Cir. 2017).  Plaintiff collectively defines WFC and WFBNA as "Wells Fargo" and treats the two entities interchangeably throughout the Complaint.  (*See, e.g.*, Compl. ¶ 1 ("For years, Wells Fargo created unauthorized bank accounts; activated unauthorized debit cards; pressured, cajoled and deceived Navajo elders; and enrolled Navajo customers in online banking services without authorization.").)  While Plaintiff's claims under the CFPA refer to the actions of "Defendants" in the aggregate, its claims are asserted only against WFC given that Plaintiff is statutorily prohibited from bringing a civil action against a national bank under the Act. 12 U.S.C. § 5552(a)(2)(A); *see also CFPB v. Great Plains Lending, LLC*, 846 F.3d 1049, 1053 (9th Cir. 2017), *cert. denied*, 2017 WL 3387727 (U.S. Dec. 11, 2017) (explaining that national banks are "excluded from the enforcement authority of the state" under the CFPA).  Plaintiff's attempt to overstep its statutory authority by suing a national bank's parent holding company and treating it as liable for the alleged actions of the national bank is unavailing given the privity of interests between WFBNA and WFC for purposes of applying *res judicata* to bar Plaintiff's claims.

Plaintiff asserts claims against WFC under the Act based entirely on alleged acts or conduct occurring in or arising from WFBNA's retail bank business. The alleged conduct underlying Plaintiff's claims include opening financial products in consumers' names without their consent (*e.g.*, bank accounts, debit and credit cards) and enrolling consumers in online banking services without authorization—the same conduct underlying the CFPB's adjudication of claims against WFBNA.  With respect to Plaintiff's first four claims under the Act, Plaintiff refers collectively to "Defendants," making no distinction between the acts of WFBNA and those of WFC.  In support of its fifth claim against WFC for providing "substantial assistance" to

---

government's own enforcement action is the basis for application of *res judicata* against a duplicative action by a secondary enforcer.

WFBNA's violations of the Act, Plaintiff contends that WFC "controlled, directed, and promoted Wells Fargo Bank, N.A.'s sales practices," and "subsequently accepted responsibility for those practices before Congress and in internal reports."  (Compl. ¶ 137.) Though WFBNA was the subject of the CFPB's Consent Order, the Consent Order noted that the CFPB "may use the practices described in this Consent Order in future enforcement actions against Respondent and its affiliates, including, without limitation, to establish a pattern or practice of violations or the continuation of a pattern or practice of violations . . . ." (Consent Order ¶ 85.)

Where, as here, a plaintiff aggregates the conduct of a parent company and subsidiary and "seeks to hold them liable for the same conduct," privity applies for purposes of *res judicata*. *Lenox*, 847 F.3d at 1241.  In *Robinson v. Volkswagenwerk AG*, 56 F.3d 1268 (10th Cir. 1995), the Tenth Circuit addressed a case in which "plaintiffs brought and lost a products liability case against a subsidiary and then filed a second products liability case against the subsidiary's parent on the theory that the parent 'had a controlling relationship with' the subsidiary." *Lenox,* 847 F.3d at 1241 (citing *Robinson,* 56 F.3d at 1275).  The Tenth Circuit "did not resolve the plaintiffs' contention that the asserted relationship actually rendered the parent liable on the merits because [it] concluded that, even '[i]f true, . . . this 'near alter ego' relationship would be sufficient to establish 'privity' between the two corporations such that [the parent] is entitled to assert the previous judgment as a bar to the claim now asserted.'" *Id.*  The Tenth Circuit most recently extended this principle in *Lenox,* and noted that "[n]umerous other circuits have found privity between related corporations without a concomitant finding of alter-ego status or an otherwise controlling relationship."  *Id*. at 1241 n.11 (citing cases).  While Plaintiff does not, and cannot, plausibly allege that WFC directly engaged in retail banking activity reserved for chartered national banks, its theory of liability for WFC under the CFPA is clearly premised on the notion that WFBNA and WFC functioned as a single entity with respect to the alleged practices at issue.[3] Given that Plaintiff seeks to hold WFC liable for the same conduct as

---

[3] Defendants are not contending that WFC and WFBNA share alter-ego status; they do not. But a finding of privity in connection with Plaintiff's CFPA claims is nonetheless compelled by the

WFBNA was in the CFPB's Consent Order, the Wells Fargo entities share privity for purposes of *res judicata* based on the Consent Order.

> **(d)** **The CFPB's and Plaintiff's Claims Under the CFPA Constitute the "Same Cause of Action."**

Plaintiff alleges that the CFPB's Consent Order "reached with Wells Fargo revealed a massive and pervasive scheme of illegal sales practices and a far-reaching, systemic breakdown in Wells Fargo's corporate governance." (Compl. ¶ 64.) Indeed, Plaintiff contends that the redress plan ordered by the CFPB in its Consent Order "demonstrates that members of the Navajo Nation are among those affected by Wells Fargo's unlawful sales practices and have incurred fees and charges due to those practices," an apparent basis for Plaintiff's current assertion of claims. (*Id.* ¶ 30.) For purposes of *res judicata*, "a cause of action includes all claims or legal theories of recovery that arise from the same transaction, event, or occurrence. All claims arising out of the transaction must therefore be presented in one suit or be barred from subsequent litigation." *Nwosun v. Gen. Mills Rests., Inc.*, 124 F.3d 1255, 1257 (10th Cir. 1997).

Factors relevant to determining whether the facts are sufficiently related to constitute a single "cause of action" include "their relatedness in time, space, origin, or motivation, and whether, taken together, they form a convenient unit for trial purposes." *Farmer Oil & Gas Props., LLC v. S. Ute Indian Tribe*, 899 F. Supp. 2d 1097, 1113 (D. Colo. 2012). Plaintiff's claims under the CFPA and the Consent Order both arise from Wells Fargo's improper sales practices over the same time period (2011 through 2016),[4] the same locations (Wells Fargo's retail branch operations, including those servicing members of the Navajo Nation),[5] and were propelled by the same motivation (cross-selling, to meet sales goals and achieve incentive

---

way Plaintiff has framed its Complaint, attempting to hold WFC liable for the same conduct as WFBNA.

[4] *Compare* Consent Order ¶ 3(j) (defining "Relevant Period" as January 2011 to September 2016), *with* Compl. ¶ 57 ("[T]hese unlawful practices occurred between (at least) 2011 and 2016").

[5] *Compare* Consent Order ¶ 3(d), (f) (improper sales practices occurred in "Community Bank Regional Bank Branch Network," meaning Wells Fargo's "retail-branch operations"), *with* Compl. ¶ 5 (alleging Wells Fargo employees at branches in Arizona, New Mexico, and Utah opened unauthorized accounts).

compensation).[6]

"Inasmuch as the doctrine of *res judicata* precludes parties from relitigating issues that were or could have been raised, parties cannot defeat its application by simply alleging new legal theories." *Clark v. Haas Group, Inc.*, 953 F.2d 1235, 1238 (10th Cir. 1992). In *King v. HSBC Bank Nevada, N.A.*, 2013 WL 12138908 (D.N.M. Dec. 16, 2013), for instance, the New Mexico Attorney General was barred from prosecuting consumer protection claims in a *parens patriae* capacity relating to ancillary products sold by HSBC Bank in light of a class action settlement relating to payment protection plans sold by HSBC Bank. *Id.* at *1. The court emphasized that the private plaintiffs had a fair opportunity to raise claims in connection with all of the ancillary services in their previous suit, and the fact that they "failed to do so" did not stop the operation of claim preclusion. *Id.* at *4; *see also Plotner v. AT & T Corp.*, 224 F.3d 1161, 1170 (10th Cir. 2000) ("The fact that [plaintiff] now presents some of her claims under the rubric of slightly different legal theories . . . does not obscure the fact that they all arise out of a single transaction."). Likewise, notwithstanding Plaintiff's assertion of different legal theories relating to Wells Fargo's sales practices and inclusion of Navajo-specific allegations, the core of its CFPA claims relate to the same sales practices misconduct investigated by the CFPB in its enforcement action. There is nothing to suggest the CFPB could not have advanced the additional legal theories that Plaintiff now asserts—and the absence of those legal theories in the Consent Order does not obscure the fact that the two lawsuits are based on the same "cause of action" for purposes of *res judicata*.

### (e)   The CFPB Had a Full and Fair Opportunity to Litigate.

"[R]es judicata does not require that the Plaintiff was a party to the previous action to have had an opportunity to fully and fairly litigate any claims, only that Plaintiff's interests were represented in the prior litigation." *HSBC Bank*, 2013 WL 12138908, at *4 (citing *Kinslow v.*

---

[6] *Compare* Consent Order ¶¶ 7-9 (WFBNA sought to distinguish itself as a leader in "cross-selling" and set sales goals and incentive compensation), *with* Compl. ¶¶ 19, 22, 42 (Wells Fargo "touted" cross-sell, and pushed employees with "aggressive sales quotas and heightened incentives").

*Ratzlaff*, 158 F.3d 1104, 1107 (10th Cir. 1998)).  "[A]ny previously unlitigated claims that could and should have been raised in the previous litigation are res judicata." *Id.* The CFPB had the opportunity to bring the claims under the CFPA which Plaintiff now asserts against WFC, *see* 12 U.S.C. § 5564, and as Plaintiff is in privity with the CFPB for purposes of enforcing the Act, its interests were represented in the CFPB's prior action.

> ### 2.   Plaintiff's *Parens Patriae* Claims Are Duplicative of a Pending Class Action Settlement, and Should Be Stayed.

Ten of Plaintiff's claims are asserted in a *parens patriae* capacity on behalf of members of the Navajo Nation.  These common law and statutory claims seek to recover damages on behalf of individual tribal members.  As discussed below, Plaintiff lacks standing to assert these claims.  However, even if the Court were to conclude that Plaintiff could assert personal damages claims belonging to tribal members, these claims are already the subject of a nationwide class action settlement which has been preliminarily approved.  The class settlement in the *Jabbari* Action settles claims arising out of alleged unauthorized deposit accounts, credit cards, lines of credit, and authorized enrollment in identity theft protection services.  (RJN, Exs. 4 (*Jabbari* Amended Settlement Agreement), & 5 (Preliminary Approval Order).)  The final approval hearing in the *Jabbari* Action is scheduled for March 22, 2018.  (*Id.,* Ex. 6.) When the class settlement becomes final, Plaintiff will be precluded from asserting any claims released by the settlement in a *parens patriae* capacity on behalf of tribal members.  *See California v. IntelliGender, LLC*, 771 F.3d 1169, 1179-80 (9th Cir. 2014) (*res judicata* bars subsequent actions by a governmental entity "for the same relief" already pursued by a private class of plaintiffs because "the requisite closeness of privity is present").[7]

---

[7] The Attorney General for the Navajo Nation submitted a letter to the settlement administrator in the *Jabbari* Action seeking to opt out from the class action both for the Navajo Nation in its own right, and "in its capacity as *parens patriae*."  To the extent the Navajo Nation AG purports to opt out individual members of the Navajo Nation from the *Jabbari* settlement, it lacks the ability to "attempt[] to effect a group-wide exclusion from an existing class" given that "[t]he right to participate, or to opt-out, is an individual one" that belongs to, and must be exercised by, individual class members.  *Hanlon v. Chyrsler Corp.*, 150 F.3d 1011, 1024 (9th Cir. 1998) (rejecting attempt by class representative of Georgia state consumer class action to opt-out of

As with the CFPB and enforcement of the CFPA, the "case law regarding *res judicata* [in the context of a class action and subsequent *parens patriae* suit] does not require that Plaintiff have been a party to the previous action in order to have had an opportunity to fully and fairly litigate its claims; Plaintiff's interests were represented by the class members." *New Mexico ex rel. King v. Capital One Bank (USA) N.A.*, 980 F. Supp. 2d 1346, 1355 (D.N.M. 2013).  In *Capital One,* Judge Johnson found that the New Mexico Attorney General's claims "seeking restitution on behalf of consumers" under consumer protection statutes were barred by *res judicata* on the basis of a class action settlement. *Id.* at 1351.  "Class members were adequately represented and given an opportunity to opt out of the settlement," and "[a]llowing the Class members to recover under both this [class action] settlement and future AG-driven litigations on the basis of the same facts would run counter to well-established class action principles and would discourage settlements, which are strongly favored." *Id.* at 1356 (quoting *Esslinger v. HSBC Bank Nevada, N.A.*, 2012 WL 5866074 at *7 n.2 (E.D. Pa. Nov. 20, 2012)).

In light of the privity between consumers and attorneys general bringing *parens patriae* suits, courts have recognized that "relief obtained by the *parens patriae* plaintiff may bar private litigants from later bringing suit," and "the potential exists for conflicts between the individual litigants and the *parens patriae* nation plaintiff over issues of settlement, appropriate relief, and the like." *Estados Unidos Mexicanos v. DeCoster*, 229 F.3d 332, 336 (1st Cir. 2000). Courts are understandably hesitant to allow a *parens patriae* suit to proceed when a consumer class action is pending—even if a class settlement has not been reached. "This strong preference for class actions over Parens patriae has been repeatedly expressed." *Pfizer, Inc. v. Lord*, 522 F.2d 612, 618 (8th Cir. 1975) (collecting cases).  In *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 2011 WL 1399441 (N.D. Cal. Apr. 13, 2011), the district court cited the pendency of a consumer class action in ordering a stay of two *parens patriae* lawsuits filed by the states of  Michigan and

---

federal class action on behalf of all Georgia residents); *see also* Newberg and Conte, *Newberg on Class Actions*, § 16.16 at 90 (3d ed. 1992) ("The decision to exercise the right of exclusion in a Rule 23(b)(3) action is an individual decision of each class member and may not be usurped by the class representative or class counsel.").

Florida against many of the same defendants relating to alleged price fixing.  *Id.* at *4.  The court relied on the "first-to-file rule" and concluded that given the "issues raised in the two lawsuits are substantially similar," and were each brought on behalf of Michigan and Florida consumers, "the first-to-file rule and the general interest in judicial efficiency" supported a stay of the states' *parens patriae* actions for up to one year, or until entry of judgment in the consumer class action. *Id.* at *1, 4–5; *see also Cessna Aircraft Co. v. Brown*, 348 F.2d 689, 692 (10th Cir. 1965) ("[S]imultaneous prosecution in two different courts of cases relating to the same parties and issues 'leads to the wastefulness of time, energy and money'").  "Exact parallelism between the two actions need not exist; it is enough if the parties and issues in the two actions are 'substantially similar.'" *In re TFT-LCD*, 2011 WL 1399441 at *2.

Here, Plaintiff seeks to recover damages under common law claims and consumer protection statutes on behalf of the individual tribal members who either will be releasing their claims through the *Jabbari* class action settlement, or have individually opted out of the settlement in order to preserve their ability to pursue their own claims in a separate suit.  If the Court finds that Plaintiff has standing to pursue its *parens patriae* claims, judicial economy and due process concerns counsel in favor of staying these claims until the *Jabbari* class action settlement becomes final.

###    B.    Plaintiff Lacks Standing to Assert Its *Parens Patriae* Claims.

Plaintiff lacks standing to pursue claims brought in a *parens patriae* capacity.  It does not qualify for *parens patriae* status with respect to its common law claims, and has not been granted enforcement authority under the consumer protection statutes it asserts. Accordingly, Plaintiff's *parens patriae* claims must be dismissed.

###        1.    Plaintiff Lacks *Parens Patriae* Standing to Assert Common Law Claims on Behalf of Individual Tribal Members.

Plaintiff's common law claims asserted in a *parens patriae* capacity seek redress for economic injuries to tribal members related to alleged unauthorized accounts. Specifically, Plaintiff alleges that "Wells Fargo's Navajo customers have suffered from: (a) monthly service charges on unauthorized accounts, (b) unauthorized accounts being placed into collection, and

(c) damage to their credit reports." (Compl. ¶ 74.) With respect to Plaintiff's fraud claim on behalf of tribal members, Plaintiff asserts that "because they were unaware of the unauthorized accounts, they were unable to close them and avoid fees and penalties. Due to Defendants' fraud, members of the Navajo Nation suffered damages in the amount of those fees and penalties . . . which the Nation can recover as *parens patriae.*" (*Id.* ¶ 186.) Plaintiff's conversion claim alleges that, *inter alia,* "[b]y assessing fees and penalties on fraudulently opened accounts," Wells Fargo "unlawfully exercised dominion and control over personal property belonging to members of the Navajo Nation." (*Id.* ¶ 188.) Plaintiff's *parens patriae* claim for unjust enrichment is likewise premised on the assessment of fees and penalties. (*Id.* ¶ 191.) These allegations involve "injuries to purely private interests," such as "property damage . . . loss of income, and other economic losses," that may not be pursued by Plaintiff in a *parens patriae* capacity. *New Mexico v. Gen. Elec. Co.*, 335 F. Supp. 2d 1185, 1241 n.121 (D.N.M. 2004) (citing *Satsky*, 7 F.3d at 1470).

To establish *parens patriae* standing for its common law claims, Plaintiff must "articulate an interest apart from the interests of particular private parties" and instead "'express a quasi-sovereign interest' that it seeks to protect." *Thiebaut v. Colo. Springs Utils.*, 455 F. App'x 795, 799–800 (10th Cir. 2011) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982)). Quasi-sovereign interests have been defined by the Supreme Court as "interest[s] apart from [those] of particular individuals who may be affected." *Georgia v. Pa. R. Co.*, 324 U.S. 439, 451 (1945). A state attorney general lacks *parens patriae* standing to recover a monetary award "solely for injury to the business and property of the state's citizens" or "money damages for injuries suffered by individuals." *People of State of N.Y. by Abrams v. Seneci*, 817 F.2d 1015, 1017 (2d Cir. 1987). "Interests of private parties are obviously not in themselves sovereign interests, and they do not become such simply by virtue of the State's aiding in their achievement." *Snapp*, 458 U.S. at 602.

Plaintiff's allegations of damage recoverable in connection with its common law *parens patriae* claims relate to "injuries to purely private interests," including "economic losses," that may not be pursued by a state as *parens patriae*. *Gen. Elec. Co.*, 335 F. Supp. 2d at 1241 n.121

15

(citing *Satsky*, 7 F.3d at 1470).  More to the point, *parens patriae* suits "cannot be brought to collect the damage claim of one legally entitled to sue in his own right."  *Pfizer*, 522 F.2d at 616. Rather, it is "those [injured] individuals"—not an attorney general—who "are the proper parties in this litigation."  *People of State of Ill. v. Life of Mid-Am. Ins. Co.*, 805 F.2d 763, 766 (7th Cir. 1986); *State of Cal. v. Frito-Lay, Inc.*, 474 F.2d 774, 775–76 (9th Cir. 1973) (explaining that courts reject *parens patriae* actions "where individuals were the real parties in interest," collecting cases).  In particular, courts decline to recognize *parens patriae* standing where "complete relief would be available to the [aggrieved individuals] themselves, were they to file a complaint on their own behalf."  *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 652 (9th Cir. 2017), *cert. denied sub nom. Missouri ex rel. Hawley v. Becerra*, 137 S. Ct. 2188 (2017).  Here, tribal members may recover their damages either through the pending class action settlement, or by opting out of the settlement and pursuing their claims through separate litigation.  Thus, Plaintiff's common law *parens patriae* claims must be dismissed for lack of standing.

### 2.     Plaintiff Lacks Standing to Assert Statutory Claims Reserved for Other Enforcement Authorities or Private Citizens.

Plaintiff also lacks standing to bring *parens patriae* claims on behalf of tribal members under the federal and state consumer protection statutes asserted in the Complaint.  "While the doctrine of *parens patriae* is available to confer standing upon a state in an action at common law, or in an instance where the class of plaintiffs is not clearly delineated by statute, it should not be used to avoid the explicit standing requirements of a statute." *In re Lacy*, 74 B.R. 23, 25 (Bankr. D. Or. 1987).  Each of the statutes Plaintiff asserts clearly delineates who may bring a claim to enforce its provisions—and Plaintiff is not included. These statutory claims must be dismissed for lack of standing.

"[W]hen determining whether a state has *parens patriae* standing under a federal statute, we ask if Congress intended to allow for such standing." *Connecticut v. Physicians Health Servs. of Conn., Inc.*, 287 F.3d 110, 120 (2d Cir. 2002) (rejecting state's assertion of *parens patriae* standing to enforce ERISA statute); *see also Estados Unidos Mexicanos*, 229 F.3d at 336 ("*parens patriae* standing should not be recognized in a foreign nation unless there is a clear

indication of intent to grant such standing expressed by the Supreme Court or by the two coordinate branches of government"). In *Hawaii v. Standard Oil Co. of California*, 405 U.S. 251 (1972), the Supreme Court rejected efforts by the state of Hawaii to assert *parens patriae* claims under the Clayton Act to recover overcharges paid by its citizens. The question of what standing, if any, was afforded to a state suing under the antitrust laws as *parens patriae* could not "be resolved simply by reference to any general principles governing *parens patriae* actions." *Id*. at 259. In light of the private damages remedy under the statute, the Court declined to recognize the state's right to pursue claims as *parens patriae*, lest the Court "open the door to duplicative recoveries." *Id*. at 262–64. Additionally, the Court pointed out that a *parens patriae* suit in this context would merely reflect "injuries to the 'business or property' of consumers, for which they may recover themselves under [the Clayton Act]." *Id*. at 264. In the absence of "a clear expression of congressional purpose" to allow a state's *parens patriae* claims under the statute, the suit warranted dismissal for lack of standing. *Id*.

Each of the federal statutes Plaintiff asserts provides for a private right of action to damaged individuals, but none permits enforcement by a tribal entity, whether as *parens patriae* or otherwise.[8] Following the Supreme Court's guidance in *Hawaii,* these claims must be

---

[8] The Equal Credit Opportunity Act ("ECOA") (Claim 6) provides that an "aggrieved applicant" may recover actual damages or, upon referral, the U.S. Attorney General may bring a civil action for actual and punitive damages and injunctive relief. 15 U.S.C. § 1691e(a). The ECOA does not authorize enforcement by any state attorneys general or by the attorney general of an Indian tribe. *Cf. id.* § 1691c (providing for enforcement by various federal agencies). The Truth In Lending Act ("TILA") (Claim 8) likewise provides a private right of action for persons who sustained actual damage, *id.* § 1640(a), and assigns specific federal agencies to enforce the statute as to specific violators. *Id.* § 1607. Plaintiff's TILA claim alleges a violation of Section 1642 of the statute, but no state attorneys general (nor the attorney general for an Indian tribe) are permitted to enforce that section. The Electronic Funds Transfer Act (Claim 7) provides a right of action to consumers, *id.* § 1693m, and provides context-specific administrative enforcement authority to various federal agencies. *Id.* § 1693o. The Fair Credit Reporting Act ("FCRA") (Claim 9) permits "consumers" to recover actual or statutory damages, as well as punitive damages. *Id.* §§ 1681n, 1681o. FCRA sets forth a complex federal enforcement scheme in which various agencies are designated to bring actions against specific violators. *Id.* § 1681s. Under certain circumstances, FCRA permits the chief law enforcement officer of a "State" to recover damages on behalf of residents of the State, but the law excludes Indian tribes from its

dismissed.  *See Frito-Lay*, 474 F.2d at 777 ("[I]f the state is to be empowered to act [as a representative of its citizens] . . . that authority must come not through judicial improvisation but by legislation and rule making"; dismissing purported statutory *parens patriae* claim).

Plaintiff similarly lacks statutory authority to bring *parens patriae* claims for violation of state and Navajo consumer protection statutes. The New Mexico Unfair Practices Act (Claim 10) authorizes its "attorney general, upon petition to the court, [to] recover, *on behalf of the state of New Mexico*," civil penalties.  NMSA 1978, § 57-12-11 (emphasis added). The Arizona Consumer Fraud Act (Claim 11) empowers the "attorney general" to collect civil penalties, A.R.S. § 44-1531, and further requires that those funds be deposited in a "revolving fund" administered by the attorney general and used to support the attorney general's operating expenses, *id.* § 44-1531.01.  The law specifically defines "attorney general" to mean "the attorney general of Arizona or the attorney general's authorized delegate."  *Id.* § 44-1521 (2). There is no statutory hook for Plaintiff to enforce these states' laws.  Similar attempts by various state attorneys general to bring *parens patriae* claims under a different state's consumer protection laws have been rejected. In *California v. Infineon Technologies AG*, 531 F. Supp. 2d 1124 (N.D. Cal. 2007), the district court dismissed claims asserted by attorneys general of five states and the Northern Mariana Islands to enforce provisions of California's antitrust law, noting that under the California statute "where the Attorney General is empowered to bring a damages action seeking relief for violation(s) . . . it is only the *California* Attorney General who is so empowered, and on behalf of *California* residents only,"  and the "out-of-state Attorneys General therefore have no parens patriae authority under the Act."  *Id*. at 1133 (emphasis in original).

Plaintiff's *parens patriae* claim under the Navajo Nation Unfair Consumer Practices Act ("UCPA"), 5 N.N.C. § 1101 *et seq*., also fails for lack of standing.  In a section titled, "Private remedies," the UCPA permits "[a]ny person who suffers any loss of money or property" as a result of unlawful practice to bring an action to recover actual or statutory damages.  *Id*.

---

definition of "State."  *Id*. § 1681a (n) ("The term 'State' means any State, the Commonwealth of Puerto Rico, the District of Columbia, and any territory or possession of the United States.").

§ 1107(B).  Nowhere in the language of the UCPA is there a grant of authority to the Navajo

Attorney General to recover these private remedies on behalf of its citizens.  By contrast, other

Navajo consumer protection statutes expressly authorize the Navajo Attorney General to seek

civil penalties and to require the offender to "make restitution to all persons" affected.  *See, e.g.,*

*id*. § 1116(B) (Navajo Pyramid Promotional Schemes Act section titled "Action by Attorney

General").  The UCPA contains an express provision for a civil remedy, but does not vest

Plaintiff with authority to pursue that remedy as *parens patriae* in lieu of the affected consumers.

### C.      **Plaintiff's Declaratory Judgment Claim, Premised on Claims Either Barred by *Res Judicata* or Which It Lacks Standing to Assert, Must Be Dismissed.**

Plaintiff asserts a standalone claim for declaratory judgment "that Defendants' practices

violate Federal consumer financial law and state and tribal unfair trade practices law" (Compl.

¶ 198), seeking relief in connection with the other claims asserted in the Complaint that are either

barred by *res judicata* or which Plaintiff lacks standing to assert. "The federal Declaratory

Judgment Act [28 U.S.C. § 2201] is procedural," and "does not create substantive rights for

parties."  *Miller v. Cincinnati Ins. Co*., 2018 WL 704719, at *1 (D.N.M. Feb. 2, 2018).

Moreover, "the requirements of pleading and practice in actions for declaratory relief are exactly

the same as in other civil actions," *id.*, meaning that "Section 2201 applies only to cases of actual

controversy" and "[a]ctual controversy does not exist if the issues . . .  [are] barred by the

principles of *res judicata*." *Charlton v. Estate of Charlton*, 48 B.R. 1012, 1014 (D. Ariz. 1985).

Similarly, "[t]hat a plaintiff seeks relief under the  Declaratory Judgment Act, 28 U.S.C. § 2201,

does not relieve him of the burden of satisfying the prerequisites for standing." *DiMaio v.

Democratic Nat'l Comm.*, 520 F.3d 1299, 1301 (11th Cir. 2008).  Plaintiff lacks standing to seek

a declaration regarding its *parens patriae* claims which it likewise lacks standing to pursue. *See

Harris*, 847 F.3d at 652 (affirming dismissal of *parens patriae* claim for declaratory judgment).

Even if the fundamental obstacles to justiciability of *res judicata* and standing were not at issue,

a court has no duty to entertain claims for declaratory judgment, and the factors guiding a court's

exercise of discretion in this regard militate in favor of dismissal of Plaintiff's claim.  *See Mid-*

*Continent Cas. Co. v. Vill. at Deer Creek Homeowners Ass'n, Inc.*, 685 F.3d 977, 980–81 (10th Cir. 2012).

      **D.**    **Plaintiff Fails to Plausibly Allege *Parens Patriae* Statutory and Common Law Claims.**

            **1.**    **Plaintiff Does Not Allege That Wells Fargo Refused Credit to Tribal Members, Precluding a Discrimination Claim Under the ECOA.**

Plaintiff asserts a *parens patriae* claim for violation of the Equal Credit Opportunity Act and Regulation B, which "prohibits creditors from discriminating 'against an applicant on a prohibited basis regarding any aspect of a credit transaction.' 12 C.F.R. § 1002.4." (Compl. ¶ 140.) The purpose of the ECOA and Regulation B "is to promote the availability of credit to all creditworthy applicants without regard to race, color, religion, national origin, sex, marital status, or age . . . ." 12 C.F.R. § 1002.1(b). The ECOA was first enacted "to eradicate credit discrimination waged against women, especially married women whom creditors traditionally refused to consider for individual credit. . . . In Congress' judgment, one's marital status—along with race, religion, and other traits, which were added to the statute in 1976—generally 'are, and must be, irrelevant to a credit judgment.'" *RL BB Acquisition, LLC v. Bridgemill Commons Dev. Grp., LLC*, 754 F.3d 380, 383 (6th Cir. 2014) (quoting S. Rep. No. 94–589, at 3 (1976), *reprinted in* 1976 U.S.C.C.A.N. 403, 405). It follows that the "ECOA requires that the creditor take an 'adverse action' against the plaintiff," defined as "a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested." *Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 754 (6th Cir. 2014) (quoting 15 U.S.C. § 1691(d)(6)). "Thus, to establish a prima facie case" under the ECOA, a plaintiff must show "(1) she is a member of a protected class; (2) she applied for a loan from [the defendant]; (3) she was qualified for the loan; and (4) despite being

qualified her loan application was denied." *Matthiesen v. Banc One Mortg. Corp.*, 173 F.3d 1242, 1246 (10th Cir. 1999).

Plaintiff does not allege that Wells Fargo *refused* to extend credit to tribal members, but rather that credit was extended to tribal members even though the members had not sought credit from Wells Fargo.  (*See* Compl. ¶ 143 (alleging Defendants discriminating against tribal members "by targeting Navajo people, because of their race, for unauthorized credit card accounts").)[9]  The ECOA is simply not applicable to Wells Fargo's alleged conduct. *See Thompson*, 773 F.3d at 754 ("Thompson's complaint—that BOA has refused to modify her repayment terms under HAMP—does not fall within the definition of 'adverse action.' She fails to state a claim under the ECOA.").[10]  In *Das v. WMC Mortgage Corp.*, 831 F. Supp. 2d 1147 (N.D. Cal. 2011), for instance, the court dismissed an ECOA claim brought by plaintiffs who failed to allege that the defendant "rejected an application for a loan for which Plaintiffs were qualified—a requirement to state a discrimination claim under ECOA. To the contrary, Plaintiffs admit they 'did not qualify for the loan' that they actually received" from the defendant.  *Id.* at 1160.  Given that amendment could not cure the deficiency in the complaint, the court dismissed the ECOA claim with prejudice.  *Id.*  Similarly here, Plaintiff's allegations that Wells Fargo

---

[9] Nor has Plaintiff alleged that Wells Fargo extended credit to the Navajo tribal members on less favorable loan terms, or in lesser amounts, than other similarly-situated individuals. *Cf. Smithville 169 v. Citizens Bank & Tr. Co.*, 2013 WL 434044, at *3 (W.D. Mo. Feb. 5, 2013) ("The statute prohibits discrimination, such as denying credit or offering credit on less favorable terms, on the basis of a woman's marital status.").

[10] *See also Kamara v. Columbia Home Loans, LLC*, 654 F. Supp. 2d 259, 267 (E.D. Pa. 2009) (plaintiff had "not identified an adverse action within the meaning of the ECOA" where defendant "did not refuse to grant the plaintiff credit"; accordingly "the plaintiff's ECOA claim is dismissed."); *Griffin v. Santander Bank*, 2014 WL 204229, at *6 (E.D.N.Y. Jan. 16, 2014) ("a *prima facie* case under the ECOA" includes showing plaintiff "was qualified for credit but defendant denied [his] credit application"); *Powell v. Am. Gen. Fin., Inc.*, 310 F. Supp. 2d 481, 487 (N.D.N.Y. Mar. 22, 2004) ("[T]o establish her claim, a plaintiff must allege that she was a member of a protected class, that she was qualified for the loan that she requested, and that the lender declined the loan and showed a preference for a non-protected individual.").

extended credit to tribal members, whether requested or not, confirms that there has been no

violation of the ECOA; the claim must be dismissed.

### 2.  Plaintiff Fails to Plausibly Allege *Parens Patriae* Claims Based on Fraud or Conversion.

Plaintiff's common law *parens patriae* claims for fraud and conversion are based on

alleged conduct occurring in at least three different states: Arizona, New Mexico, and Utah.[11]

Regardless of which state's law applies to which tribal member's claim being asserted in *parens*

*patriae*, Plaintiff has failed to plead fraud with the particularity required by Federal Rule of Civil

Procedure 9(b).  Plaintiff's conversion claim relating to funds on deposit with Wells Fargo is also

a non-starter, given that money deposited with a bank becomes the property of the bank.  A

depositor as creditor may have a claim for repayment or for breach of contract against the bank,

but a bank cannot be sued in tort for converting its own property.

#### (a)  *Plaintiff Fails to Plead Its Fraud Claim, Brought as* **Parens Patriae**, *With Sufficient Particularity.*

Plaintiff alleges that Wells Fargo "failed to inform members of the Navajo Nation that

accounts and credit lines were being opened on their behalf without their authorization," leading

the members "to believe that each of their accounts with Wells Fargo was authorized."  (Compl.

---

[11] The Complaint identifies 17 Wells Fargo branches which "serve[] members of the Navajo Nation": 10 branches are located in Arizona, six branches are located in New Mexico, and one branch is located in Utah. (Compl. ¶ 15.)  Of these 17 branches, Plaintiff contends that five are operated "across the Navajo Nation" in Arizona and New Mexico. (*Id.*)  For purposes of a choice-of-law analysis, Navajo law is facially inapplicable for the bulk of the transactions that underlie Plaintiff's claims: As a general matter, "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe," *Montana v. United States,* 450 U.S. 544, 565 (1981), and even the narrow exceptions to the prohibition on tribes regulating the conduct of non-members do not extend to "the activities or conduct of non-Indians occurring *outside their reservations.*" *Hornell Brewing Co. v. Rosebud Sioux Tribal Court*, 133 F.3d 1087, 1091 (8th Cir. 1998) (emphasis in original). And, in any event, even Navajo courts may decide issues "with reference to the laws of the state in which the matter in dispute may have arisen" where Navajo law is silent.  7 N.N.C. § 204(D); *see also Harvey v. United States*, 2011 WL 13174559, at *6 (D.N.M. June 30, 2011) (applying Arizona tort law to malpractice claim occurring on part of Navajo territory within state of Arizona).

¶ 185.)  Plaintiff further contends that "because they were unaware of the unauthorized accounts, they were unable to close them and avoid fees and penalties."  (*Id.* ¶ 186.)  Whether under the laws of Arizona, New Mexico, or Utah, fraud requires a false representation of a material fact, with the speaker's knowledge of its falsity or reckless disregard for its truth, made for the purposes of inducing reliance in the listener, and the listener's reasonable reliance which proximately caused it injury.  *Taeger v. Catholic Family & Cmty. Servs.*, 995 P.2d 721, 730 (Ariz. Ct. App. 1999); *Armed Forces Ins. Exch. v. Harrison*, 70 P.3d 35, 40 (Utah 2003); *Cain v. Champion Window Co. of Albuquerque, LLC*, 164 P.3d 90, 97 (N.M. Ct. App. 2007).  Plaintiff does not attempt to allege any damage resulting from purported affirmative misrepresentations, and instead focuses the allegation of harm as resulting from tribal members' lack of awareness of unauthorized accounts. Among other things, "a complaint alleging fraud [must] 'set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'"  *Tal v. Hogan*, 453 F.3d 1244, 1263 (10th Cir. 2006); *see also United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 726–27 (10th Cir. 2006) (Rule 9(b) requires a plaintiff to "set forth the 'who, what, when, where and how' of the alleged fraud" with particularity).  Plaintiff's fraud by omission claim lacks the particularized, plausible factual allegations demanded by Rule 9(b).[12]

Plaintiff fails to identify *who* specifically failed to inform the tribal members of misconduct at Wells Fargo, *what* specifically should have been said, or *when* it should have been said—and whether that was before or after the relevant Wells Fargo employees allegedly became

---

[12] To the extent Plaintiff's claim for violation of the Arizona Consumer Fraud Act is predicated on fraudulent statements or omission, it also fails Rule 9(b)'s pleading standard.  *See Maricopa Cnty. v. Office Depot, Inc.*, 2014 WL 6611562, at *7 (D. Ariz. Nov. 21, 2014) ("[C]ontrary to plaintiff's contention, there is not 'less particularity' required for an Arizona Consumer Fraud Act claim.").

aware of the alleged truth and omission.  In *Koch v. Koch Industries, Inc.*, 203 F.3d 1202 (10th Cir. 2000), the Tenth Circuit determined that, notwithstanding the plaintiffs' invocation of a relaxed pleading standard, the plaintiffs were precluded from pursuing fraud claims where the complaint "d[id] not alert the Defendants to a sufficiently precise time frame [when the alleged misrepresentations were made] to satisfy Rule 9(b)," "specifie[d] nothing about the content of the alleged misrepresentations" other than a general statement, and "failed to identify any specific Defendant who made these alleged fraudulent misrepresentations or omissions, a particularly important requirement in th[e] case because of the number of individual defendants involved." *Id.* at 1237.  Attributing a misrepresentation to unspecified representatives of a defendant is "insufficient under rule 9(b)" because a "defendant does not have fair notice of a plaintiff's claim if he does not even know which people allegedly made false statements on his behalf." *Butera v. Crane*, 2014 WL 5849317, at *9 (D. Colo. Nov. 12, 2014); *see also Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011) (Rule 9(b) "does not allow a complaint to . . . lump multiple defendants together"; upholding district court's dismissal of complaint containing "everyone did everything" allegations); *cf. Fid. Nat'l Title Ins. Co. v. Worthington*, 344 P.3d 156, 160 (Utah Ct. App. 2015) (claim properly dismissed where plaintiff asserted "Defendants as a group had failed to disclose information").

Plaintiff also fails to adequately allege scienter.  Collective intent or knowledge on the part of a corporation is insufficient to plead an intentional tort, such as fraud; instead, a "plaintiff must prove that at least one agent of the corporation had all of the requisite knowledge to support the claim." *Helf v. Chevron U.S.A. Inc.*, 361 P.3d 63, 69–70 (Utah 2015).  Because fraud requires intent to deceive, a plaintiff cannot prove fraud by omission unless it proves "actual knowledge." *Anderson v. Kriser*, 266 P.3d 819, 825 (Utah 2011); *Frazier v. Sw. Sav. & Loan*

*Ass'n*, 653 P.2d 362, 367 (Ariz. Ct. App. 1982) (liability for nondisclosure requires showing of defendant's knowledge of material fact).  Thus, Plaintiff must plausibly allege that a specific individual at Wells Fargo had actual knowledge of the truth and caused the omission with an intent to deceive, and that the omission was material in the context of a particular tribal member's account.  Plaintiff has not done so, and instead impermissibly lumps all the alleged misconduct of "Defendants" together.  This is insufficient to sustain a fraud claim.

### *(b)   Plaintiff Fails to State a Claim for Conversion.*

Plaintiff's *parens patriae* claim for conversion is premised on the allegation that Defendants assessed fees and penalties against tribal members on fraudulently opened accounts; moved funds among accounts without authorization; and withheld funds from tribal members. (Compl. ¶ 188.)  However, no conversion action lies for money on deposit at Wells Fargo because when funds are deposited in a bank, the money becomes the property of the bank and the depositor is a mere creditor with a claim for repayment against the debtor bank.[13]  "A bank account is not a storage vault for a depositor's money.  It is nothing more than evidence of a credit relationship between a bank and its customer.  The funds are 'owned' by the bank which has borrowed from its depositor.  Until repaid, the funds 'on deposit' belong to the bank which is a debtor of the customer.  The customer does not 'own' any money until the bank honors a withdrawal record of transfer request." *United States v. Lee*, 973 F.2d 832, 835 (10th Cir. 1992)

---

[13] *See Universal Mktg. & Entm't, Inc. v. Bank One of Ariz., N.A.*, 53 P.3d 191, 194 (Ariz. Ct. App. 2002) ("The general rule is that 'the relation between a general depositor and the bank in which his deposit is made is simply that of debtor and creditor.  The moneys deposited immediately become the property of the bank, and the latter becomes debtor of the depositor . . . .'"); *United States v. Intermountain Region Concrete Co.*, 636 F. Supp. 280, 284 (D. Utah 1986), *rev'd on other grounds but aff'd in relevant part sub nom United States v. Cache Valley Bank*, 866 F.2d 1242, 1244 (10th Cir. 1989); *cf. Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 21 (1995) (a bank account "consists of nothing more or less than a promise to pay, from the bank to the depositor, and petitioner's temporary refusal to pay was neither a taking of possession of respondent's property nor an exercising of control over it, but merely a refusal to perform its promise.") (internal citations omitted).

(McKay, C.J., concurring) (internal citation omitted).  Because "the money thus becomes the literal property of the bank, it cannot be tortiously converted by the bank."  *Crocker-Citizens Nat'l Bank v. Control Metals Corp.*, 566 F.2d 631, 637 (9th Cir. 1977).[14]

### E. The Nation Fails to State a Claim of Common Law Fraud in Its Own Capacity.

Plaintiff also asserts a claim for fraud in its own capacity, alleging that, by way of a January 3, 2017 letter delivered to the Navajo Nation's Budget and Finance Committee, Defendants "materially misrepresented whether the Wells Fargo account scandal had affected members of the Navajo Nation."  (Compl. ¶ 179.)  Plaintiff contends this misrepresentation was made "in an effort to lull the Navajo Nation into not investigating Wells Fargo's conduct as to the Navajo Nation's citizens or pursuing claims against Wells Fargo" (*id.* ¶ 72), and that Wells Fargo's "fraudulent concealment of its wrongdoing has prevented the Navajo Nation from obtaining a full understanding of the nature and extent to which Wells Fargo's unlawful sales practices affected the Navajo Nation's citizens." (*Id.* ¶ 181.) Plaintiff has failed to identify a cognizable injury sufficient to support this fraud claim, warranting dismissal of this claim.

Detrimental reliance on a misrepresentation requires a "substantial and material change of position," *Weiner v. Romley*, 381 P.2d 581, 584 (Ariz. 1963), and Plaintiff's asserted lack of a "full understanding" of the impact of Wells Fargo's sales practices on individual tribal members clearly has not prevented Plaintiff from filing a lawsuit asserting those members' personal claims in a *parens patriae* capacity, or reasserting the same claims under the CFPA that the CFPB resolved in the September 2016 Consent Order.  Moreover, courts have declined to find "harm"

---

[14] *See also, e.g.*, *Parker State Bank v. Pennington*, 9 F.2d 966, 969 (8th Cir. 1925) ("The money deposited with the bank was not a special deposit … with an obligation of the bank to return the identical thing deposited; the depositor retaining title.  The plaintiff, therefore, was not entitled to maintain an action for conversion …" (internal citations omitted)); *Newbro v. Freed*, 409 F. Supp. 2d 386, 396 (S.D.N.Y. 2006); *Mijatovich v. Columbia Sav. & Loan Ass'n*, 522 N.E.2d 728, 730–31 (Ill. App. Ct. 1988); *Costoso v. Bank of Am., N.A.*, 74 F. Supp. 3d 558, 573–74 (E.D.N.Y. 2015) (noting "[m]oney deposited in a general account at a bank does not remain the property of the depositor"; finding "the Plaintiff's conversion claim is simply a restatement of the breach of contract claim based on the Defendant's assessment of overdraft fees")) (citation and internal quotation marks omitted).

where the only alleged injury resulting from a defendant's alleged misrepresentation is the delay of a lawsuit. For instance, in *Employers Reinsurance Corp. v. GMAC Insurance*, 308 F. Supp. 2d 1010 (D. Ariz. 2004), the plaintiff alleged that the defendant-insurance company's employee issued a letter stating that the insurer would protect the plaintiff's lien. *Id.* at 1017. The plaintiff later argued that, based on the letter, the defendant was estopped from arguing against the plaintiff's right to recover on the lien. *Id.* at 1018. The court rejected this argument, explaining that the plaintiff had not shown any "substantial detriment" resulting from the letter. *Id.* at 1018–19. The court specifically rejected the argument that delay of the plaintiff's lawsuit could constitute the requisite harm, emphasizing that an actionable injury from a defendant's misrepresentation "must be real and not technical or formal in nature." *Id.* at 1018; *accord Sukup Mfg. v. Rushing*, 634 F. Supp. 2d 694, 698 (S.D. Miss. 2009) (ruling that plaintiff "cannot establish detrimental reliance merely by showing that [defendant's] alleged promise led it to delay planned litigation"); *HCFA Assocs. Corp. v. Grosman*, 960 F. Supp. 581, 588 (E.D.N.Y. 1997) (rejecting plaintiffs' arguments of injury from fraud in the form of expenses incurred investigating truth of defendant's statements and delays and uncertainties caused by statements). Plaintiff's own claim for fraud must be dismissed.

## IV.   CONCLUSION

For the foregoing reasons, Defendants respectfully request an order dismissing Plaintiff's claims under the Consumer Financial Protection Act (Claims 1-5) as barred by *res judicata*, dismissing Plaintiff's purported *parens patriae* claims (Claims 6-11 and 13-16) for lack of standing or failure to state a claim (or, alternatively, staying these claims pending final resolution of the *Jabbari* settlement), dismissing Plaintiff's declaratory judgment claim (Claim 17) as barred by *res judicata* and for lack of standing, and dismissing Plaintiff's fraud claim (Claim 12) for failure to allege a cognizable injury.

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.


By:  *"Electronically Filed" /s/ Andrew G. Schultz*     .
       Andrew G. Schultz
P.O. Box 1888
Albuquerque, NM 87103
Telephone:    (505) 765-5900
Facsimile:    (505) 768-7395
E-mail:      aschultz@rodey.com

      -and-

MUNGER, TOLLES & OLSON LLP
   David H. Fry
560 Mission Street, 27th Floor
San Francisco, CA 94105
Telephone:    (415) 512-4000
E-mail:      David.Fry@mto.com

MUNGER, TOLLES & OLSON LLP
   Erin J. Cox
   Eric P. Tuttle
   Susan S. Har
   Samuel H. Allen
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Telephone:    (213) 683-9100
E-mail:      Erin.Cox@mto.com
             Eric.Tuttle@mto.com
             Susan.Har@mto.com
             Samuel.Allen@mto.com

*Attorneys for Defendants Wells Fargo & Company and*
*Wells Fargo Bank, N.A.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on February 26, 2018, the foregoing *Defendants'*
*Motion to Dismiss Plaintiff's Claims Or, In the Alternative, To Stay Plaintiff's* Parens Patriae
*Claims* was electronically filed with the Clerk of Court using the CM/ECF system, which will
send notification of such filing to the following:

> Jana C. Werner
> Assistant Attorney General
> Navajo Nation Department of Justice
> Office of the Attorney General
> P.O. Box 2010
> Window Rock, AZ 86515
> jwerner@nndoj.org
>
> Ethel Branch
> Attorney General
> Navajo Nation Department of Justice
> Office of the Attorney General
> P.O. Box 2010
> Window Rock, AZ 86515
> ebranch@nndoj.org
>
> John C. Hueston
> Douglas J. Dixon
> Hueston Hennigan LLP
> 523 West 6th Street, Suite 400
> Los Angeles, CA 90014
> jhueston@hueston.com
> ddixon@hueston.com

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.

By:    */s/ Andrew G. Schultz*                          .
      Andrew G. Schultz