## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

**NAVAJO NATION, a federally
recognized Indian Tribe, on its own
behalf, by Ethel B. Branch, Attorney
General of the Navajo Nation, and as
*parens patriae* on behalf of the Navajo
people,**

      **Plaintiff,**

**vs.**                                       **Case No. 17-CV-1219-JAP-SCY**

**WELLS FARGO & COMPANY,
WELLS FARGO BANK, N.A., and
DOES 1–10,**

      **Defendants.**

## MEMORANDUM OPINION AND ORDER

On December 12, 2017, Plaintiff Navajo Nation (Plaintiff or the Nation), a federally

recognized Indian Tribe, filed suit on its own behalf and as *parens patriae* on behalf of the

Navajo people against Defendants Wells Fargo & Company (WFC), a financial services

company, and Wells Fargo Bank, N.A. (WFBNA), a national banking association that is the

primary subsidiary of WFC, along with Does 1-10 (the Doe Defendants), who are yet-to-be

identified agents and principals of WFC and WFBNA.[1] Plaintiff brings claims under federal,

state, and tribal law arising out of unfair, deceptive, fraudulent, and illegal banking practices that

Plaintiff alleges have harmed Plaintiff's sovereign and quasi-sovereign interests. WFC and

WFBNA (together, Wells Fargo or Defendants) filed a motion on February 26, 2018, to dismiss

Plaintiff's claims on the grounds of res judicata, lack of standing, and failure to state a claim.[2]

---

[1] *See* COMPLAINT (Doc. 1).
[2] *See* DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CLAIMS OR, IN THE ALTERNATIVE, TO STAY
PLAINTIFF'S *PARENS PATRIAE* CLAIMS (Doc. 25) (Motion).

Alternatively, Defendants request a limited stay as to Plaintiff's *parens patriae* claims pending settlement of nationwide consumer class action *Jabbari, et al. v. Wells Fargo & Co., et al.*, Case No. 3:15-cv-02159-VC (N.D. Cal.).[3] The Motion is fully briefed.[4] The Court will grant the Motion.

## I.    BACKGROUND[5]

Wells Fargo is one of the biggest banks in the United States. Compl. ¶ 15. For years, Wells Fargo increased its sales by engaging in illegal banking practices, defrauding customers nationwide for its own financial gain. *Id.* ¶ 16. Wells Fargo employees were shamed, disciplined, demoted, and fired for failing to meet sales goals. *Id.* ¶¶ 20–23. They were incentivized to pad sales numbers by management's acceptance and sometimes even active encouragement of misconduct. *Id.* ¶ 23. As a result of the intense pressure to meet unattainably high sales quotas, Wells Fargo employees created fake accounts and signed customers up for debit cards, credit cards, and online banking services without their knowledge. *Id.* ¶¶ 23–25.

Wells Fargo employees regularly practiced techniques such as (1) "bundling," in which a customer was falsely told that the account or product the customer desired was only available as part of a package with other unneeded products or services; (2) "pinning," in which an employee obtained a debit card and assigned it a PIN without customer authorization, and then used that PIN to enroll the customer in online banking services without permission; and (3)

---

[3] The United States District Court for the Northern District of California granted final approval of the settlement on June 14, 2018, and entered judgment on July 24, 2018. *See Jabbari*, No. 15-cv-02159-VC, Revised Order Granting Final Approval of Class Action Settlement, Approving Service Awards, and Awarding Attorney's Fees and Expenses (Doc. 271), and Judgment (Doc. 320). The judgment is now on appeal in the Ninth Circuit Court of Appeals.

[4] *See* PLAINTIFF NAVAJO NATION'S OPPOSITION TO DEFENDANT WELLS FARGO & COMPANY AND WELLS FARGO BANK N.A.'S MOTION TO DISMISS (Doc. 32) (Response); DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S CLAIMS OR, IN THE ALTERNATIVE, TO STAY PLAINTIFF'S *PARENS PATRIAE* CLAIMS (Doc. 35) (Reply).

[5] Facts recited are taken from the Complaint or from documents of which the Court may take judicial notice, and are viewed in the light most favorable to Plaintiff. *See Pace v. Swerdlow*, 519 F.3d 1067, 1073 (10th Cir. 2008) (In resolving a motion to dismiss, the Court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." (internal quotation marks omitted)).

"sandbagging," in which the opening or processing of accounts was purposefully delayed without customer knowledge so that the accounts could be included in a new sales reporting period. *Id.* ¶ 24. Wells Fargo employees also lied to customers by representing that accounts did not have fees when they did, or by falsely telling customers that they were required to open a savings account to avoid a monthly checking account fee. *Id.* ¶ 25. Employees forged customer signatures or obtained customer signatures fraudulently by stating that forms to be signed were related to existing accounts, then using those forms to open additional accounts without customer knowledge or consent. *Id.* When Wells Fargo employees did inform a customer that an account had been opened and the customer would be receiving a credit card, they then told the customer to simply destroy the card if the account was unwanted and led the customer to erroneously believe that this would terminate the account. *Id.*

In September 2016, Wells Fargo's actions were exposed to the public when the Consumer Financial Protection Bureau (CFPB) announced that "Wells Fargo employees secretly opened unauthorized accounts to hit sales targets and receive bonuses." *Id.* ¶ 3. The CFPB entered into a Consent Order (CFPB Consent Order, Doc. 26-1) with WFBNA and its "successors and assigns," finding that WFBNA had violated the Consumer Financial Protection Act of 2010 (CFPA) by opening unauthorized accounts, submitting unauthorized credit card applications, enrolling customers in unrequested online banking services, and ordering and activating debit cards without customer knowledge or consent. *Id.* ¶ 27; CFPB Consent Order ¶¶ 3(k), 9–37. Wells Fargo's own analysis concluded that 1,534,280 deposit accounts may not have been properly authorized or funded, and that 85,000 of these accounts had incurred $2 million in fees. Compl. ¶ 28. Similarly, Wells Fargo found that 565,443 credit card accounts may have been unauthorized, and 14,000 of those accounts had incurred over $400,000 in fees. *Id.* One outside

3

record review reported a total of 3.5 million potentially fake accounts and 528,000 Wells Fargo customers who had been enrolled in online bill pay without their consent. *Id.* ¶ 26. The CFPB found that WFBNA had violated the CFPA's ban on unfair, deceptive, or abusive practices. *See* 12 U.S.C. § 5536(a)(1). The CFPB ordered Wells Fargo to (1) review and report on its practices; (2) develop a plan to correct any deficiencies; (3) develop and implement a plan to redress harm to its consumers, for which it was required to segregate $5 million; and (4) pay a $100 million civil penalty. *See* CFPB Consent Order ¶¶ 39–42, 49–50, 52, 57.

Wells Fargo's internal investigations demonstrated that the employee misconduct had been most prevalent in California and Arizona. Compl. ¶ 35. The Nation reached out to Wells Fargo after the CFPB disclosures, seeking to determine whether any of the unlawful sales practices had affected Navajo tribal members. *Id.* ¶ 68. Wells Fargo is the primary provider of banking and financial services to the Nation, which is located in the states of Arizona, New Mexico, and Utah. *Id.* ¶ 15. Wells Fargo operates five branches in Arizona and New Mexico that are inside the boundaries of the Nation, along with additional branches in Arizona, New Mexico, and Utah within half an hour's drive from the Nation's borders. *Id.* Wells Fargo is the only brick and mortar national bank that serves this geographic area. *Id.* ¶ 75. And because Navajo tribal members living on the Nation often have limited access to computers, Wells Fargo is the only banking option for many Navajo people. *Id.* ¶¶ 44, 49, 75. Wells Fargo, through its Vice President Aaron Lemke, assured the Nation that the improper actions had not impacted the Navajo community, that no tribal members in Arizona or New Mexico had been harmed, and that no Wells Fargo employees at branches located on the Nation had been terminated. *Id.* ¶¶ 69–70. The Nation later discovered that these representations were false, and that the Navajo community had not only been impacted, but had been specifically targeted. *Id.* ¶¶ 43, 60, 71.

Interviews with former Wells Fargo employees and the limited internal records that have since been produced demonstrate that unlawful practices did occur on the Nation and that internal investigations into reports of misconduct were often closed as unsubstantiated because of difficulty contacting customers. *Id.* ¶ 57. Wells Fargo later sent notices of the *Jabbari* class action to affected Navajo citizens. *Id.* ¶ 71. *Jabbari* settled claims based on the same unlawful practices found by the CFPB that were brought under the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq., state consumer protection laws, and a common law theory of unjust enrichment. *See Jabbari*, No. 3:15-cv-02159-VC, Class Action Complaint (Doc. 5).

Wells Fargo systematically preyed on Navajo tribal members by instituting unfair, deceptive, fraudulent, and illegal practices in connection with the financial products and services Wells Fargo offered to tribal members. *Id.* ¶ 57. From at least 2011 until 2016, Wells Fargo employees, under pressure from their supervisors to increase Wells Fargo's revenue, enrolled Navajo customers in a variety of banking services and financial products without permission or by obtaining the customers' consent through fraud or deception. *Id.* The pressure on employees was especially strong on the Nation, where unemployment rates reach 42 percent. *Id.* ¶¶ 22, 45. Wells Fargo employees coerced vulnerable Navajo citizens into signing up for unnecessary accounts by falsely telling Navajo elders who did not speak English and were unfamiliar with banking services that a savings account was required to have a check cashed, or by insisting that they open a different savings account for each type of expense, and by refusing to give them their money until they signed up for additional accounts. *Id.* ¶¶ 49–50. Sales personnel who spoke Navajo used their language skills to gain the trust of non-English speaking tribal members, and then asked them to sign documents that they did not understand, accepting a thumb print in place of a signature for those who could not write their names. *Id.* ¶ 50. Employees created email

addresses for tribal members who did not have computer access so that they could enroll the customers in online banking, and they targeted often-illiterate Navajo women selling native crafts at local events. *Id.* ¶¶ 54, 56. Wells Fargo employees pressured their own family members to agree to unwanted products or services, telling them falsely that the accounts could easily be closed at any time; and they illegally enrolled underage Navajos in multiple accounts by falsifying birthdates to avoid the requirement for parental consent. *Id.* ¶¶ 52–53. Navajo tribal members were harmed by these practices, which resulted in accounts that were opened without the required disclosures and consent, unauthorized or unnecessary monthly service charges or other fees, and collections actions and damage to credit reports that would not have occurred but for the unauthorized or coercive enrollments. *Id.* ¶¶ 59, 74. Additionally, the Nation has been forced to expend significant funds to investigate the extent of Wells Fargo's misdeeds. *Id.* ¶ 75.

## II.    LEGAL STANDARD

The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367 because the Nation brings related claims under federal, state, and tribal law. In evaluating a motion to dismiss, the Court takes all allegations of material fact in the Complaint as true and construes them in the light most favorable to the nonmoving party. *Warth v. Seldin*, 422 U.S. 490, 501 (1975). In order to survive a dismissal motion, however, Plaintiff must allege facts that are enough to raise its right to relief "above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Complaint "does not need detailed factual allegations," but "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action[.]" *Id.* A plaintiff must allege "enough facts to state a claim to relief that is plausible on its face," not just conceivable. *Id.* at 570.

The Court will not consider materials outside of the pleadings when resolving a motion to dismiss, other than those referenced in the Complaint and central to Plaintiff's claim, or court documents of which the Court may take judicial notice. *See Pace*, 519 F.3d at 1072–73 (In deciding a motion to dismiss, district courts may properly consider documents referred to in the complaint and central to the plaintiff's claim, and may take judicial notice of adjudicative facts.); *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("[F]ederal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.").

## III.    DISCUSSION

The Nation brings seventeen claims for relief based on Wells Fargo's unlawful sales practices, acting on its own behalf and in its capacity as *parens patriae*. Defendants assert that dismissal of Plaintiff's claims is warranted based on res judicata, lack of standing, and failure to state a claim.

### A.    Claims for Violation of the CFPA, 12 U.S.C. § 5536(a)

The Nation's first five claims, alleging violations of the CFPA, are only against WFC and the Doe Defendants. The CFPA prohibits any provider of consumer financial products or services from "commit[ting] any act or omission in violation of a Federal consumer financial law[,] . . . engag[ing] in any unfair, deceptive, or abusive act or practice[, or] . . . knowingly or recklessly provid[ing] substantial assistance to a covered person or service provider in violation of the provisions of section 5531 of this title[.]" 12 U.S.C. §§ 5481(6), 5536(a)(1)(A)–(B), 5536(a)(3). Section 5531 defines the parameters of what the CFPB may consider unfair or abusive contrary to the CFPA. An act or practice may be declared unfair if it "causes or is likely

to cause substantial injury to consumers which is not reasonably avoidable by consumers[] and

. . . is not outweighed by countervailing benefits to consumers or to competition."

§ 5531(c)(1)(A)–(B). The CFPB "may consider established public policies [in making this

determination, but they] may not serve as [its] primary basis[.]" § 5531(c)(2). An act or practice

may be considered abusive if it:

> (1) materially interferes with the ability of a consumer to understand a
> term or condition of a consumer financial product or service; or
> (2) takes unreasonable advantage of--
> (A) a lack of understanding on the part of the consumer of the material
> risks, costs, or conditions of the product or service;
> (B) the inability of the consumer to protect the interests of the consumer in
> selecting or using a consumer financial product or service; or
> (C) the reasonable reliance by the consumer on a covered person to act in
> the interests of the consumer.

§ 5531(d). The Nation has the authority to enforce the CFPA, *see* 12 U.S.C. §§ 5481(27), 5552,

and it brings the CFPA claims in its own capacity. Defendants argue that Plaintiff only has

secondary enforcement authority under the CFPA, while the CFPB is the primary enforcer, and

that Plaintiff's claims are precluded by the CFPB Consent Order.

"Under res judicata, or claim preclusion, a final judgment on the merits of an action

precludes the parties or their privies from relitigating issues that were or could have been raised

in the prior action." *Satsky v. Paramount Commc'ns, Inc.*, 7 F.3d 1464, 1467 (10th Cir. 1993)

(internal quotation marks omitted). "A claim is barred by res judicata if three elements exist: (1)

a final judgment on the merits in the prior suit; (2) the prior suit involved identical claims as the

claims in the present suit; and (3) the prior suit involved the same parties or their privies." *Id.*

Res judicata is an affirmative defense, but may be raised in a motion to dismiss if the facts

supporting the defense appear on the face of the complaint, or in documents subject to judicial

notice, or if there is no factual dispute. *See Merswin v. Williams Cos., Inc.*, 364 F. App'x 438,

441 (10th Cir. Feb. 3, 2010) (unpublished decision); *Q Int'l Courier, Inc. v. Smoak*, 441 F.3d 214, 216 (4th Cir. 2006) ("When entertaining a motion to dismiss on the ground of res judicata, a court may take judicial notice of facts from a prior judicial proceeding when the res judicata defense raises no disputed issue of fact.").

Although the CFPB resolved WFBNA's violation of the CFPA by consent order, "a consent decree is afforded the same effect as any other judgment." *Satsky*, 7 F.3d at 1468. Consequently, a consent decree will generally support claim preclusion. *See Arizona v. California*, 530 U.S. 392, 414 (2000). "However, this circuit has recognized 'that consent decrees are of a contractual nature and, as such, their terms may alter the preclusive effects of a judgment.'" *In re Young*, 91 F.3d 1367, 1376 (10th Cir. 1996) (quoting *May v. Parker-Abbott Transfer & Storage, Inc.*, 899 F.2d 1007, 1010 (10th Cir. 1990)). Defendants contend that the CFPB Consent Order is not a consent decree at all, and is instead an administrative adjudication that specifically states that it is not a contract. They argue that the Consent Order is therefore a final judgment that precludes the Nation's claims against WFC.

Citing *Amoco Production Company v. Heimann*, 904 F.2d 1405, 1417 (10th Cir. 1990), Defendants contend that the procedural framework of a decision determines whether an agency acted in its judicial capacity for the purposes of res judicata. Because the CFPB invoked its adjudicatory authority and included findings of fact and conclusions of law, Defendants maintain that the CFPB Consent Order is not a consent decree. However, *Amoco* addressed the circumstances under which the decision of a state agency is made in its judicial capacity so as to be entitled to full faith and credit by a federal court, resulting in the same preclusive effect to which the agency decision would be entitled in the state court. *Amoco* did not discuss or

distinguish administrative consent orders and judicial consent decrees, and it did not address

preclusion based on a consent order or decree.

Relying on *Saline River Properties, LLC v. Johnson Controls, Inc.*, 823 F. Supp. 2d 670,

675 (E.D. Mich. 2011), Defendants argue that a party's consent does not determine whether an

order constitutes a consent decree. *Saline River* differentiated between an administrative consent

order and a judicial consent decree when holding that a breach of contract claim could not be

based on alleged violations of an administrative consent order. *Saline River* is not binding on this

Court, and the Court does not find the decision persuasive because it included no analysis or

reasoning for the distinction and it did not discuss preclusion principles. Defendants present no

authority suggesting that the preclusion analysis is different for an administrative consent order

than for a judicial consent decree, and the Court is not aware of any.

> Consent decrees and orders have attributes both of contracts and of judicial
> decrees or, in this case, administrative orders. While they are arrived at by
> negotiation between the parties and often admit no violation of law, they are
> motivated by threatened or pending litigation and must be approved by the court
> or administrative agency.

*United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 236 n.10 (1975).

Defendants point out that the CFPB Consent Order specifies that it does not form a

contract, but this provision states only that the Consent Order does not form "a contract binding

the [CFPB] or the United States." *See* CFPB Consent Order ¶ 86. This limitation might affect a

claim for breach of contract such as that in *Saline River*, but the Court does not construe it as

requiring a change in the preclusion analysis because the Court is not enforcing the Consent

Order against the CFPB or the United States.

> To be sure, consent decrees bear some of the earmarks of judgments
> entered after litigation. At the same time, because their terms are arrived at
> through mutual agreement of the parties, consent decrees also closely resemble
> contracts. More accurately, then, as we have previously recognized, consent

> decrees have attributes both of contracts and of judicial decrees, a dual character that has resulted in different treatment for different purposes. The question is not whether we can label a consent decree as a contract or a judgment, for we can do both.

*Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 519 (1986) (internal citations and quotation marks omitted); *see also Sinclair Oil Corp. v. Scherer*, 7 F.3d 191, 193 (10th Cir. 1993) ("Consent decrees . . . have characteristics both of contracts and of final judgments on the merits."). The Court will therefore look to the CFPB Consent Order itself and will construe it as a contract. *See Satsky*, 7 F.3d at 1468; *DeLorme Publ'g Co., Inc. v. Int'l Trade Comm'n*, 805 F.3d 1328, 1331 (Fed. Cir. 2015) ("Consent orders are interpreted as contracts."). In doing so, the Court may rely upon common aids to construction, including "the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree." *ITT Cont'l Baking*, 420 U.S. at 238.

A consent decree has preclusive effect "if it is clear that the parties intended preclusion as a part of their agreement." *Id.* (internal brackets and quotation marks omitted). The Nation contends that the CFPB Consent Order is not intended to be preclusive because it specifically contemplates other legal actions based on the same facts. The CFPB Consent Order refers to the "California Enforcement Action" and other "Related Consumer Actions" in which WFBNA or its successors or assigns might be found liable, and it prohibits the use of any judgment in those actions to offset liability under the CFPB Consent Order. CFPB Consent Order ¶ 61. The California Enforcement Action is the lawsuit *People v. Wells Fargo & Co., et al.*, case number BC580778, which was filed by the Los Angeles City Attorney in Los Angeles Superior Court. CFPB Consent Order ¶ 3(c). "'Related Consumer Actions' means a private action by or on behalf of one or more consumers or an enforcement action by a governmental agency other than

11

the California Enforcement Action, brought against Respondent based on substantially the same facts as described in Section IV of this Consent Order." CFPB Consent Order ¶ 3(i).

Additionally, the CFPB Consent Order states that its provisions "do not bar, estop, or otherwise prevent the Bureau, or any other governmental agency, from taking any other action against Respondent, except as described in Paragraph 85." CFPB Consent Order ¶ 84. However, in Paragraph 85, the CFPB "releases and discharges Respondent from all potential liability for law violations that the Bureau has or might have asserted based on the practices described in Section IV of this Consent Order, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date." *Id.* ¶ 85.

Defendants argue that the release in Paragraph 85 precludes other actions brought under the CFPA that are based on the same illegal practices. They assert that the other legal actions allowed by the CFPB Consent Order are limited to non-CFPA claims, which the CFPB could not have asserted and to which the release does not apply. By its terms, Paragraph 85 of the CFPB Consent Order releases WFBNA, along with its successors and assigns, from "all potential liability" for violations of the CFPA that occurred before the date of the order and were known to the CFPB. The CFPB Consent Order therefore operates as a final judgment on the merits of the CFPA claims against WFBNA. *See Satsky*, 7 F.3d at 1468.

The Nation contends that because Paragraph 85 releases only the CFPB's claims against WFBNA, it does not bar CFPA claims brought by the Nation or CFPA claims brought against WFC, which was not a party to the CFPB Consent Order. *See Abbasid, Inc. v. First Nat'l Bank of Santa Fe*, Case Nos. CV-09-00347 JP/LFG, Consolidated with CV-09-00354 JP/LFG, 2010 WL 11509104, *11 (D.N.M. Feb. 10, 2010) ("'[t]he alter ego doctrine is a sword, not a shield, the basis for a cause of action, not a defense.'" (quoting *Lumpkin v. Envirodyne Indus., Inc.*, 933

12

F.2d 449, 460 (7th Cir. 1991) (release of subsidiary did not clearly release parent corporation

from liability))). However, Defendants argue that WFC is entitled to benefit from the CFPB's

release of WFBNA because, as a related corporate entity, WFC is in privity with WFBNA for the

purposes of res judicata. *See Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221,

1240–41 (10th Cir. 2017); *Robinson v. Volkswagenwerk AG*, 56 F.3d 1268, 1275 (10th Cir. 1995).

       In *Lenox*, the Tenth Circuit Court of Appeals held that claim preclusion barred an

antitrust suit brought against several related corporate entities when a prior suit had resolved the

liability of another related corporation based on the same underlying events. 847 F.3d at 1241,

1246. The corporate entity named in the first suit was not a party to the second suit, but the

defendants' antitrust liability was dependent on their status as a single enterprise that also

included the nonparty entity. *Id.* at 1239. The Court concluded that the defendants and the

nonparty corporation were in privity because they were being treated as the same entity and their

conduct was being evaluated as unitary. *Id.* at 1241. After determining that the plaintiff had a full

and fair opportunity to litigate its antitrust claim in the first suit because it could have discovered

the corporate relationships and the alleged monopolization, the *Lenox* Court held that the

antitrust claims were precluded by the judgment in the first suit. *Id.* at 1246. Similarly in

*Robinson*, the Court held that a parent corporation was entitled to assert a prior judgment in favor

of its subsidiary on a product liability claim as a bar to the plaintiff's suit attempting to hold the

parent corporation liable for tort claims based on the actions of the subsidiary and arising from

the same transaction. 56 F.3d at 1275.

       While the Nation does not bring its CFPA claims against WFBNA, the sales practices of

WFBNA are the acts that form the basis for the claims. The Nation refers to Defendants

collectively throughout the Complaint and describes their conduct as unitary in its allegations.

Claims I–III allege actions only by "Defendants" or "Wells Fargo" and do not mention WFC specifically other than one allegation in Claim II that Navajo consumers had reasonably relied on WFC to protect their interests. In Claim IV, the Nation alleges violation of the CFPA through violation of five other Federal consumer financial laws, but describes prohibited conduct by WFC only when claiming violation of Regulation DD implementing the Truth in Savings Act. *See* Compl. ¶¶ 128–131. Even then, the conduct at issue is failing to provide account disclosures to consumers, which is still a function of WFBNA's retail banking business. Only Claim V is premised specifically on alleged acts of WFC, but those allegations still implicate WFBNA because the claimed violation consists of providing substantial assistance to WFBNA in committing its unfair, abusive, and deceptive acts. *See* Compl. ¶¶ 133–137. The Court finds that Defendants are treated as a single entity in the Complaint and that WFC's liability under the CFPA is dependent on the actions of WFBNA and its related corporate status. Accordingly, the Court concludes that WFC is in privity with WFBNA for res judicata purposes. Hence, WFC will be entitled to assert the CFPB Consent Order as a bar to the Nation's CFPA claims if (1) those claims are identical to the ones resolved in the CFPB Consent Order; and (2) there is privity between the Nation and the CFPB.

Claims are identical, so as to preclude further litigation, when they constitute the same cause of action. *Nwosun v. Gen. Mills Rests., Inc.*, 124 F.3d 1255, 1257 (10th Cir. 1997). "Under [the Tenth Circuit's transactional] approach, a cause of action includes all claims or legal theories of recovery that arise from the same transaction, event, or occurrence." *Id.* A series of connected transactions is also considered a single cause of action. *Petromanagement Corp. v. Acme-Thomas Joint Venture*, 835 F.2d 1329, 1335 (10th Cir. 1988).

> What factual grouping constitutes a transaction, and what groupings constitute a series, are to be determined pragmatically, giving weight to such considerations as

> whether the facts are related in time, space, origin, or motivation, whether they
> form a convenient trial unit, and whether their treatment as a unit conforms to the
> parties' expectations or business understanding or usage.

*Id.* (internal quotation marks omitted).

Defendants contend that the Nation's CFPA claims are based on the same series of connected transactions as those resolved by the CFPB Consent Order because they all arise from WFBNA's improper sales practices at its retail banking locations from 2011 through 2016, which were motivated by its high pressure sales culture. The same types of unauthorized accounts and services form the primary factual basis for both actions. The Nation argues that its allegations that Navajo consumers were specifically targeted with predatory sales practices describe conduct that was not at issue in the CFPB proceeding and is not part of the same series of transactions. However, the Nation's claims under the CFPA are still based on the same systemic practice of unfair, abusive, and deceptive acts that was detailed in the CFPB Consent Order. The acts occurred during the same time period, in the same general location at WFBNA's retail banking facilities, and with the same origin and motivation associated with Defendants' high-pressure sales culture. The Nation alleges specific facts, not listed in the CFPB Consent Order, as to improper practices at the particular retail branches on and near the Nation and the use and effect of these practices on Navajo consumers. However, it also argues that WFC bears responsibility for actions at WFBNA branch locations precisely because they were part of Defendants' corporate culture. The Court concludes that these practices are part of the same series of connected occurrences and form the same cause of action for preclusion purposes.

Despite the similar basis for the actions, preclusion is only appropriate if the Nation is in privity with the CFPB because the Nation was not a party to the CFPB Consent Order. *See Taylor v. Sturgell*, 553 U.S. 880, 892–93 (2008) (discussing the general rule against nonparty

preclusion and noting that it is subject to exceptions). In *Taylor*, the United States Supreme Court discussed six recognized categories of exceptions to the rule against nonparty preclusion: (1) the nonparty agrees to be bound; (2) the nonparty is in a qualified pre-existing substantive legal relationship with a party to the judgment; (3) the interests of the nonparty were adequately represented by a party with the same interests; (4) the nonparty assumed control over the litigation; (5) the nonparty is acting as a proxy to relitigate a suit for a party; and (6) a special statutory scheme expressly prohibits successive litigation by nonparties. *See id.* at 893–95.

However, the organization of these established grounds is not definitive. *Id.* at 893 n.6. "The substantive legal relationships justifying preclusion are sometimes collectively referred to as 'privity.'" *Id.* at 894 n.8. But "[t]he term 'privity' . . . has also come to be used more broadly, as a way to express the conclusion that nonparty preclusion is appropriate on any ground." *Id.* "[I]t is a label that seeks to convey the existence of a relationship sufficient to give courts confidence that the party in the former litigation was an effective representative of the current party's interests." *Entek GRB, LLC v. Stull Ranches, LLC*, 763 F.3d 1252, 1258 (10th Cir. 2014). Defendants argue that the Nation is in privity with the CFPB because the special statutory scheme established by the CFPA demonstrates that the CFPB is an effective representative of the Nation's interests. The Nation, however, asserts that it is not in privity with the CFPB because it is a separate sovereign with its own enforcement authority and the CFPB has not adequately represented its interests.

Defendants' reliance on the CFPA as the type of "special statutory scheme" referred to in *Taylor* as a justification for nonparty preclusion may be misplaced. *Taylor* describes statutes that "expressly foreclos[e] successive litigation by nonlitigants[,]" such as "bankruptcy and probate proceedings, . . . and *quo warranto* actions or other suits that, 'under [the governing] law, [may]

16

be brought only on behalf of the public at large.'" 553 U.S. at 895 (quoting *Richards v. Jefferson Cty.*, 517 U.S. 793, 797 (1996)). The CFPA is intended to protect the interests of the general public. *See* § 5511(a) (describing the purpose of the CFPB to "enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive."). Suits may not be brought by individual plaintiffs. *Mayall v. Randall Firm, PLLC.*, No. 1:13-cv-00166-TC, 2017 WL 3432033, *2 (D. Utah, Aug. 9, 2017) (no private right of action under the CFPA); *Beider v. Retrieval Masters Creditors Bureau, Inc.*, 146 F.Supp.3d 465, 472 (E.D.N.Y. 2015) (same). However, there are multiple governments authorized to enforce the CFPA under certain circumstances. *See* 12 U.S.C. §§ 5511, 5552. And no provision of the statute *expressly* prohibits successive litigation by a nonparty to the first suit.

Accordingly, the Court will analyze whether the CFPB adequately represented the Nation's interests. The elements of adequate representation for the purposes of nonparty preclusion are grounded in the requirements of due process. *Taylor*, 553 U.S. at 896–97. "A party's representation of a nonparty is 'adequate' for preclusion purposes only if, at a minimum: (1) The interests of the nonparty and her representative are aligned; and (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty." *Id.* at 900 (internal citations omitted). "In addition, adequate representation sometimes requires (3) notice of the original suit to the persons alleged to have been represented[.]" *Id.*

The Nation argues that none of these prerequisites have been fulfilled. Moreover, it asserts that the existence of privity is a factual issue that cannot be decided at this stage because

its Complaint does not allege that the CFPB made efforts to protect nonparties and does not allege that the Nation had notice of the CFPB action. However, specific efforts to protect the interests of a nonparty are required only if the litigating party does not intend to act as a representative of the nonparty's interests, and notice to a nonparty is only sometimes required. *See Taylor*, 553 U.S. at 900 n.11 ("[N]otice is required in some representative suits, e.g., class actions seeking monetary relief. . . . But [the Supreme Court has] assumed without deciding that a lack of notice might be overcome in some circumstances." (citing *Richards*, 517 U.S. at 801.)).

Defendants argue that the CFPB's broad federal interests include the interests of the Nation and demonstrate that the CFPB is an effective representative of the Nation. The purpose of the CFPB is to "enforce Federal consumer financial law consistently" for the benefit of all consumers. 12 U.S.C. § 5511(a). The CFPB is the primary enforcer of the CFPA, 12 U.S.C. §§ 5511(c), 5515(c), while states and federally recognized tribes such as the Nation have only secondary enforcement authority, 12 U.S.C. §§ 5481(27), 5552. The CFPB alone is authorized to bring a civil action to enforce the provisions of the CFPA against a national bank or federal savings association. § 5552(2). Secondary enforcers may file suit under the CFPA only against entities authorized to do business under state law, and only after notifying the CFPB. § 5552. The CFPB then has the right to intervene in the case and to appeal any resulting judgment. § 5552(b). The Court concludes that Plaintiff's interest in enforcing the CFPA is aligned with that of the CFPB, which understood itself to be acting as a representative of all consumers, including the Nation and its members, when it took enforcement action against WFBNA. *See Satsky*, 7 F.3d at 1470 (citizens are bound by a state's litigation of public rights); *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 340–41 (1958) (government litigation precludes relitigation by individuals asserting only general public interest). The Nation is not an individual

18

plaintiff, but it asserts the same public interest already protected by the CFPB Consent Order. Although the text of the CFPA does not specifically prohibit successive enforcement actions, the Court finds that the statutory division of enforcement authority and lack of a private right of action demonstrate that action by the CFPB is intended to represent the interests of all consumers nationwide. Accordingly, the Court concludes that the Nation is in privity with the CFPB for its CFPA claims. Because the CFPB could have raised these claims previously, Plaintiff had an opportunity to fully and fairly litigate. Claims 1–5 of the Nation's Complaint are barred by res judicata and will be dismissed.

## B.    Federal *Parens Patriae* Claims

In addition to the CFPA claims against WFC, the Nation brings a variety of federal, state, tribal, and common law claims against all Defendants in its capacity as *parens patriae* on behalf of the Navajo people. *See* Compl. Claims 6–11 and 13–16. The Court will first address Plaintiff's federal law claims. Plaintiff alleges violations of (1) the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691 et seq. and Regulation B, 12 C.F.R. Pt. 1002 (Claim 6); (2) the Electronic Funds Transfer Act (EFTA), 15 U.S.C. § 1693 et seq. and Regulation E, 12 C.F.R. Pt. 1005 (Claim 7); (3) the Truth in Lending Act (TILA), 15 U.S.C. § 1601 et seq. and Regulation Z, 12 C.F.R. Pt. 1026 (Claim 8); and (4) the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 et seq. (Claim 9).

The doctrine of *parens patriae* "refers to the 'right of a State to sue ... to prevent or repair harm to its "quasi-sovereign" interests.'" *BP Am., Inc. v. Oklahoma*, 613 F.3d 1029, 1031 n.* (10th Cir. 2010) (quoting *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 258 (1972)). "When a state litigates common public rights [under the doctrine of *parens patriae*], the citizens of that state are represented in such litigation by the state and are bound by the judgment." *Satsky*, 7 F.3d at

19

1470. But in this case, Defendants argue that the Nation's *parens patriae* claims belong to the individual tribal members, and the Nation lacks standing to raise them.

Defendants maintain that Plaintiff is not entitled to bring these *parens patriae* claims because the statutory civil enforcement provisions do not provide Plaintiff with a right of action. A statutory cause of action extends only to the class of plaintiffs who have been legislatively authorized to sue. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 1386–88 (2014). Defendants rely primarily on *Standard Oil*, 405 U.S. at 259–63, in which the Supreme Court declined to permit the state of Hawaii to recover damages to its general economy in a *parens patriae* suit for antitrust violations under § 4 of the Clayton Act, 15 U.S.C. § 15. Defendants contend that *Standard Oil* dismissed the state's claims for lack of standing due to the private remedies provided under the statute and the lack of a "clear expression of congressional purpose" to allow *parens patriae* claims. However, *Standard Oil* did not expressly hold that the state did not have standing to pursue a *parens patriae* claim, only that the monetary relief requested by the state was not available, in part due to the statutory language and in part to the Court's concern about the possibility of double recovery. *See* 405 U.S. at 263–66.

Other cases have held that a statutorily limited right of action will preclude *parens patriae* standing. In *Connecticut v. Physicians Health Services Of Connecticut, Inc.*, the Second Circuit Court of Appeals concluded that the state lacked prudential standing to bring a *parens patriae* claim under ERISA because the statute allowed only a "'participant, beneficiary, or fiduciary' of an ERISA-regulated plan to bring a civil action for injunctive and equitable relief." 287 F.3d 110, 120 (2d Cir. 2002); *accord Connecticut v. Health Net, Inc.*, 383 F.3d 1258, 1262 (11th Cir. 2004). Other parts of ERISA specified only certain actions that could be filed by the Secretary of Labor or by states, and case law has consistently interpreted ERISA "as strictly

limiting 'the universe of plaintiffs who may bring certain civil actions.'" *Physicians Health Servs.*, 287 F.3d at 121 (quoting *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 247 (2000) (emphasis deleted)). However, the Second Circuit Court of Appeals disclaimed any intent to require a specific statutory provision allowing *parens patriae* suits:

> By holding that the State lacks *parens patriae* standing because § 1132(a)(3) does not expressly provide for such standing, we do not of course intend to imply that states may only sue in their *parens patriae* capacity when a statute specifically provides for suits by states. "[S]tates have frequently been allowed to sue in *parens patriae* to . . . enforce federal statutes that . . . do not specifically provide standing for state attorney generals." *New York ex rel Vacco v. Mid Hudson Med. Group, P.C.*, 877 F.Supp. 143, 146 (S.D.N.Y.1995) (collecting cases). *But cf. Standard Oil Co.*, 405 U.S. at 264, 92 S.Ct. 885 (rejecting *parens patriae* standing in a suit for damages in the absence of a "clear expression of congressional purpose" allowing such standing because of the concern of double recovery). As the district court correctly pointed out, however, "the federal statutes under which states have been granted *parens patriae* standing all contain broad civil enforcement provisions" that "permit suit by any 'person' that is 'injured' or aggrieved.'" *PHS*, 103 F.Supp.2d at 509–10 (collecting federal statutes with broad enforcement provisions). Section 1132 of ERISA, by contrast, carefully limits the parties who may seek relief.

*Id.*

The Nation contends that an affirmative grant of statutory standing is not required, that *parens patriae* suits are permissible when a statute allows for broad civil enforcement, and that the statutes under which it brings its claims provide generally inclusive rights of action. Defendants acknowledge that *parens patriae* suits have been allowed without a specific state right of action when a statute permits suit by any injured person, but they argue that these particular statutes contain more limited enforcement provisions and should not be interpreted to grant a right of action to the Nation.

Under the ECOA, an "aggrieved applicant" may bring a claim for monetary damages and equitable and declaratory relief. *See* 15 U.S.C. § 1691e(a)–(c). An "applicant" is "any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies

to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously
established credit limit[.]" 15 U.S.C. § 1691a(b). The EFTA creates a civil cause of action for
consumers, who may recover actual and statutory damages in individual or class actions. *See* 15
U.S.C. § 1693m. "[T]he term 'consumer' means a natural person." 15 U.S.C. § 1693a(6). "[A]ny
person" with respect to whom a creditor has violated TILA may bring an individual or class
action for actual and statutory damages. *See* 15 U.S.C. § 1640; *Christ v. Beneficial Corp.*, 547
F.3d 1292, 1298 (11th Cir. 2008) (no implied right under TILA to an injunction or other
equitable relief). The FCRA provides for liability to the consumer or to a consumer reporting
agency in the amount of actual or statutory damages. 15 U.S.C. §§ 1681n–1681o.

Some of these statutory enforcement provisions are more limited than others, both in
terms of the class of plaintiffs authorized to sue and in terms of the allowable relief. The Court
doubts that the Nation is an "aggrieved applicant" or a "consumer," and even if it is a "person" it
may not be a person with respect to whom TILA has been violated. However, this analysis does
not implicate Article III standing or the Court's jurisdiction to hear the case, which must be
decided first. *See American Humanist Ass'n, Inc. v. Douglas Cty. Sch. Dist. RE-1*, 859 F.3d
1243, 1260 (10th Cir. 2017); *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1126 (10th
Cir. 2013) ("[W]henever standing is unclear, we must consider it *sua sponte* to ensure there is an
Article III case or controversy before us.").

"'Parens patriae standing has been explained on the ground that the plaintiff state is not
merely advancing the rights of individual injured citizens, but has an additional sovereign or
quasi-sovereign interest.'" *Satsky*, 7 F.3d at 1469 (quoting 17 Charles A. Wright, Arthur R.
Miller & Edward H. Cooper, Federal Practice and Procedure: Jurisdiction 2d § 4047 at 223
(1988)). "In order to maintain [a *parens patriae*] action, the State must articulate an interest apart

from the interests of particular private parties, i.e., the State must be more than a nominal party."

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592, 607 (1982). "The State

must express a quasi-sovereign interest." *Id.* "[A] state may not sue to assert the rights of private

individuals." *Satsky*, 7 F.3d at 1469; *see also Snapp*, 458 U.S. at 602 (private interests do not

become quasi-sovereign "simply by virtue of the State's aiding in their achievement."). "[I]f the

State is only a nominal party without a real interest of its own[,] then it will not have standing

under the *parens patriae* doctrine." *Snapp*, 458 U.S. at 600.

Some courts have held that a statute may specifically authorize *parens patriae* actions

that would not meet common-law standing requirements. *See Pennsylvania v. Mid-Atlantic

Toyota Distribs., Inc.*, 704 F.2d 125, 129 n.8 (4th Cir. 1983).

> The conclusion that courts have drawn from *Mid-Atlantic Toyota* is that while real
> party in interest status is coextensive with common law *parens patriae* authority,
> a statute may provide a broader right of action than the common law. In that
> situation, a state could have statutory *parens patriae* authority to bring an action
> without having common law *parens patriae* authority to bring the action (i.e.,
> without being a real party in interest).

*West Virginia ex rel. McGraw v. Comcast Corp.*, 705 F.Supp.2d 441, 447 (E.D. Pa. 2010).

However, even if this were true in the Tenth Circuit, none of the statutes relied on by Plaintiff

specifically authorize Plaintiff to sue in the public interest. The ECOA permits the United States

Attorney General to bring civil enforcement actions on behalf of the general public. *See* 15

U.S.C. § 1691e(h). The EFTA specifies administrative enforcement by various federal agencies,

*see* 15 U.S.C. § 1693o, but contains no provision for civil liability to the general public. TILA

permits public enforcement by State attorneys general only as to specified sections of the statute,

which do not include 15 U.S.C. § 1642. *See* 15 U.S.C. § 1640(e). A "State" may bring an action

on behalf of its residents to enforce the FCRA, but the statutory definition of "State" does not

include tribes. *See* 15 U.S.C. §§ 1681a(n), 1681s. Accordingly, the Court concludes that Plaintiff

must demonstrate that it has a quasi-sovereign interest at stake to bring its statutory *parens patriae* claims.

A quasi-sovereign interest generally concerns either the physical and economic health of a State's residents or the State's "interest in not being discriminatorily denied its rightful status within the federal system." *Snapp*, 458 U.S. at 607. However, there is no "exhaustive formal definition nor a definitive list of qualifying interests." *Id*. Examples of quasi-sovereign interests include abating a public nuisance, preventing environmental pollution, or avoiding economic damage of such severity and pervasiveness that it causes injury not only to individual citizens, but to the welfare, prosperity, and economic standing of the State as a whole. *See id.* at 603–06. Considering both direct and indirect damages, "more must be alleged than injury to an identifiable group of individual residents[;]" the harm must affect "a substantial segment of [the] population." *Id.* at 607. Also, the State's broad interest in the welfare of the populace, as implicated in each case, "must be sufficiently concrete to create an actual controversy between the State and the defendant." *Id.* at 602.

"[P]laintiffs bear the burden of establishing that they qualify for *parens patriae* standing." *Thiebaut v. Colorado Springs Utils.*, 455 F. App'x 795, 800 (10th Cir. 2011). The Nation contends that it has standing to bring its *parens patriae* claims based on its quasi-sovereign interest in the economic health and well-being of its people, including protection from fraud and relief from discriminatory financial practices. Plaintiff argues that its "Complaint describes at length how Wells Fargo's fraudulent sales practices have harmed the economic health of the Nation's citizens as a whole, and how this harm is exacerbated by the fact that Wells Fargo is the only national bank that services the Nation's geographic area." Resp. at 13. It also "alleges that Wells Fargo employees focused unfair and fraudulent sales practices on

24

members of the Nation, targeting Navajo citizens (and other Native Americans) based on their race, gender, or age." *Id.* at 14.

Economic health is a quasi-sovereign interest when the alleged harm impacts the economy as a whole. *See New York ex rel. Abrams v. Seneci*, 817 F.2d 1015, 1017 (2d Cir. 1987) (contrasting the quasi-sovereign interest in an injury to a state's general economy with the private interest in compensatory damages owed to injured individual consumers); *Pennsylvania ex rel. Shapp v. Kleppe*, 533 F.2d 668, 674 (D.C. Cir. 1976) ("[T]he controversy must in substance implicate the state's interest in economic supervision, and not merely affect the fortunes of a limited class of her citizens). Likewise, while "securing residents from the harmful effects of discrimination" may be a quasi-sovereign interest, both the injury and the proposed relief must involve more than individual interests. *See Snapp*, 458 U.S. at 609–10 (injunction sought to relieve discrimination suffered by residents of Puerto Rico that had resulted not only in job losses to individuals, but in the "universal sting" of the Puerto Rican labor force being considered inferior, and in Puerto Rico being "denied its rightful status within the federal system" through full participation in a federal employment scheme).

> A state that sues as *parens patriae* must seek to redress an injury to an interest that is separate from the interests of particular individuals. The state cannot merely litigate as a volunteer the personal claims of its competent citizens. Where the complaint only seeks to recover money damages for injuries suffered by individuals, the award of money damages will not compensate the state for any harm done to its quasi-sovereign interests. Thus, the state as *parens patriae* lacks standing to prosecute such a suit.

*Seneci*, 817 F.2d at 1017 (internal citations omitted); *see also Pennsylvania v. New Jersey*, 426 U.S. 660, 665 (1976) ("It [is] settled doctrine that a State has standing to sue only when its sovereign or quasi-sovereign interests are implicated and it is not merely litigating as a volunteer

the personal claims of its citizens."); *Satsky*, 7 F.3d at 1469 ("[A] state may not sue [in its *parens patriae* capacity] to assert the rights of private individuals.").

The Nation's *parens patriae* claims are based on allegations that Defendants harmed individual tribal members by creating unauthorized bank accounts, obtaining unauthorized credit reports, and issuing unauthorized credit cards, debit cards, and PINs. The relief sought by the Nation largely consists of compensatory damages for this individual harm, in the amount of improper fees, service charges, and penalties that were assessed on unauthorized cards and accounts, collections and damage to individuals' credit reports, emotional distress suffered by tribal members, and where allowed, punitive or treble damages. The Nation asserts that because of the particular vulnerability of the Navajo people and their lack of access to any other banking option, Defendants' predatory practices have also harmed the Nation as a whole, and it argues that it seeks civil penalties and injunctive and declaratory relief to remedy this widespread harm, in addition to compensation for tribal members' private losses. These asserted quasi-sovereign interests might be sufficient to establish *parens patriae* standing, at least at the motion to dismiss stage. However, the Nation must allege facts that demonstrate its standing for each claim and each form of relief it seeks in its Complaint. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). With respect to its federal statutory claims, the Court concludes that Plaintiff has failed to do so.

In its ECOA claim, Plaintiff alleges that Defendants targeted members of the Navajo Nation for unauthorized credit card accounts based on their race and their age. Compl. ¶¶ 143, 145; *see* 15 U.S.C. § 1691(a). Plaintiff claims that as a result, tribal members were damaged in the amount of the fees assessed on the unauthorized credit cards, the harm done to individuals' credit reports, and the emotional distress caused by the violations. Compl. ¶ 146. However,

Plaintiff does not plead any harm to the Nation itself from these alleged violations, and the private monetary relief requested would not redress any such injury. Under the EFTA, Plaintiff alleges that Defendants issued unrequested debit cards and PINs that were either already validated when issued or were later validated without the proper disclosures or verification of the consumer's identity. Compl. ¶ 154; *see* 15 U.S.C. § 1693i. The Nation does not describe damages that are specific to this claim, but the alleged injuries were inflicted on individuals, and Plaintiff does not plead any separate harm to its quasi-sovereign interests. Plaintiff similarly alleges that Defendants violated TILA by issuing unrequested credit cards to members of the Navajo Nation. Compl. ¶ 158; *see* 15 U.S.C. § 1642. Again, Plaintiff does not plead any facts demonstrating broader harm to its quasi-sovereign interests, beyond the impact on individual tribal members. Additionally, neither the EFTA nor TILA provide relief beyond actual and statutory damages. Finally, Plaintiff alleges that Defendants violated the FCRA by regularly pulling the credit reports of Navajo consumers without their knowledge or consent. Compl. ¶ 165; *see* 15 U.S.C. § 1681b. But as with the other asserted violations of federal consumer protection laws, the Nation fails to describe any separate harm to its quasi-sovereign interests from this alleged violation, and the public remedies it requests in its general prayer for relief are not available to it on these claims.

In *Snapp*, the Supreme Court warned that a broadly conceived quasi-sovereign interest "risks being too vague to survive the standing requirements of Art. III[.]" 458 U.S. at 602. Here, Plaintiff has failed to allege facts that would support its assertion of injury to the Nation as a whole, apart from the private injuries suffered by members of the Navajo tribe. Plaintiff argues that its economy was damaged, but pleads only financial harm to identifiable individuals. It alleges discrimination based on race and age, but claims no resulting injury other than private

financial and emotional damages. "[N]o state has a legitimate quasi-sovereign interest in seeing that consumers or any other group of persons receive a given sum of money." *Mid-Atlantic Toyota*, 704 F.2d at 129 n.8 (internal quotation marks omitted). Accordingly, the Court finds that Plaintiff has not alleged injury to a quasi-sovereign interest that is "sufficiently concrete to create an actual controversy between the [Nation] and [Defendants]." *Snapp*, 458 U.S. at 602. Plaintiff does not have standing in its *parens patriae* capacity to bring claims that involve injuries to purely private interests. *See Satsky*, 7 F.3d at 1470. The Court therefore concludes that Plaintiff has failed to establish its standing to bring claims under the ECOA, the EFTA, TILA, and the FCRA, and the Court will dismiss these claims for lack of jurisdiction.

## C.      State and Tribal Claims

Plaintiff brings its remaining *parens patriae* claims under state and tribal statutes or the common law. It alleges violations of the New Mexico Unfair Practices Act (NMUPA), NMSA § 57-12-1 et seq. (Claim 10); the Arizona Consumer Fraud Act (ACFA), A.R.S. § 44-1522 et seq. (Claim 11); and the Navajo Nation Unfair Consumer Practices Act (NNUCPA), 5 N.N.C. § 1101 et seq. (Claim 16); in addition to common law causes of action for fraud (Claim 13); and unjust enrichment (Claim 15).[6] Plaintiff also seeks damages for fraud in its own capacity (Claim 12), alleging that Defendants falsely informed the Nation that no tribal members had been affected by Defendants' unlawful practices to dissuade the Nation from investigating possible injuries to Navajo consumers. *See* Compl. ¶¶ 179–182. But because the Court has dismissed all of Plaintiff's federal claims, it lacks an independent basis for original jurisdiction over the state and tribal law causes of action. *See Gaines v. Ski Apache*, 8 F.3d 726, 729 (10th Cir. 1993) ("Indian tribes are not citizens of any state for purposes of diversity jurisdiction."); *Kaw Nation*

---

[6] Plaintiff has withdrawn Claim 14, which alleged common law conversion. *See* Resp. at 2 n.1.

*ex rel. McCauley v. Lujan*, 378 F.3d 1139, 1143 (10th Cir. 2004) (alleged violation of tribal law does not state a federal question).

"When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) (quoting S*mith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998)); *see also* 28 U.S.C. § 1367(c)(3) (allowing district court to decline to exercise supplemental jurisdiction over state-law claims when it has dismissed all claims within its original jurisdiction). "[T]ribal courts are best qualified to interpret and apply tribal law." *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 16 (1987). Accordingly, the Court declines to exercise supplemental jurisdiction and will dismiss Plaintiff's state and tribal claims.

**D.      Claim for Declaratory Relief**

Plaintiff's final claim seeks a declaration that Defendants' practices were reckless, willful, and knowing violations of Federal consumer financial law and state and tribal unfair practices law. Compl. ¶¶ 198–199. This request for relief is based on the violations Plaintiff asserted in Claims 1–11 and 16. However, the Declaratory Judgment Act does not create an independent basis of jurisdiction. *See Fry Bros. Corp. v. Dep't of Hous. & Urban Dev.*, 614 F.2d 732, 733 (10th Cir. 1980). Additionally, a declaratory judgment requires a case of actual live controversy. 28 U.S.C. § 2201(a). "[I]t is well established that what makes a declaratory judgment action a proper judicial resolution of a case or controversy rather than an advisory opinion is the settling of some dispute which affects the behavior of the defendant toward the plaintiff." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1110 (10th Cir. 2010) (internal quotation marks and citation omitted). The Court lacks jurisdiction to resolve debates that have become moot. *See id.* "'The crucial question is whether granting a *present*

determination of the issues offered will have some effect in the real world.'" *Id.* (quoting *Wyoming v. U.S. Dep't of Agric.*, 414 F.3d 1207, 1212 (10th Cir. 2005)). Here, the Court has determined that Plaintiff's claims for violation of the CFPA are barred by res judicata and that Plaintiff lacks standing to bring its *parens patriae* claims asserting violations of federal law. It has declined to exercise supplemental jurisdiction over Plaintiff's state and tribal law claims. Accordingly, providing declaratory relief to Plaintiff would not settle any ongoing dispute affecting the legal relations of the parties, and the Court therefore concludes that it lacks jurisdiction over this claim and will dismiss it on that basis.

 IT IS THEREFORE ORDERED that:

 (1) DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S CLAIMS OR, IN THE ALTERNATIVE, TO STAY PLAINTIFF'S *PARENS PATRIAE* CLAIMS (Doc. 25) is GRANTED; and

 (2) Claims 1–5 in Plaintiff's Complaint are dismissed with prejudice;

 (3) Claims 6–9 and Claim 17 in Plaintiff's Complaint are dismissed without prejudice for lack of jurisdiction; and

 (4) Claims 10–16 in Plaintiff's Complaint are dismissed without prejudice.

_____
SENIOR UNITED STATES DISTRICT JUDGE